## 42.   VIRGINIA BRIDGE & IRON COMPANY *v.* CRAFTS.

1. In no trial should the scope of the court's instructions to the jury be more limited or more extensive than the range of the relevant evidence properly submitted therein. The charge of the court should be pertinent and applicable to the issues presented by the evidence, and

it is error to charge the jury upon a theory which is not sustained by evidence.

2. Where one of the issues was whether there was no contract, or a certain definite contract, charges applicable to the nature of a contract which had not been shown to exist were properly refused.

3. A contract will be construed as made for a legal, rather than for an illegal purpose; and the more especially when such contract is attacked by a party thereto who has been benefited thereby.

4. "Courts hold themselves bound to the observance of rules of extreme caution, when invoked to declare a transaction void on grounds of public policy; and prejudice to the public interest must clearly appear before a court will be warranted in pronouncing the transaction void on this account. It is not to be lightly inferred from facts and circumstances of doubtful import and meaning, or which may admit of different construction, one consistent with and the other opposed to unquestioned policy." *Smith* v. *DuBose*, 78 *Ga.* 415, 3 S. E. 314, 6 Am. St. Rep. 260.

5. "Where the government offers contracts for public works to the lowest bidder, the public is deeply interested in free competition in the bidding; and as a general rule any agreements among contractors to suppress the bidding, and thereby to acquire the contract from the government at a higher figure than could otherwise be obtained if the competition was left untrammeled, are held to be illegal." 15 Am. & Eng. Enc. Law (2d ed.), 953.

6. "'A joint proposal, the result of honest co-operation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. . . . The public may obtain at least the benefit of the joint responsibility and of the joint ability to do the service.'" "In all contracts secured in such a manner, the courts should never hesitate to protect parties in their agreements with each other and compel them to comply with the terms thereof." Hoffman v. McMullen, 83 Fed. 377, 28 C. C. A. 183, 45 L. R. A. 410. "The rule rendering illegal contracts suppressing competition in the letting of public constructions does not render illegal bona fide partnership agreements for bidding for such contracts, or other bona fide arrangements between prospective bidders, whereby a bid for the entire contract is put in and the parties to the agreement are each to do a part of the work; the object of the parties not being to suppress competition." 15 Am. & Eng. Enc. Law (2d ed.), 953.

7. The judgment refusing a new trial is not, for any reason assigned, erroneous.

Complaint, from city court of Atlanta—Judge Reid. July 2, 1906.

Argued January 16,—Decided June 19, 1907.

*Dorsey, Brewster, Howell & Heyman, Francis L. Eyles,* for plaintiff.

*Westmoreland Brothers, Hamilton Douglas,* for defendant.

RUSSELL, J.   The Virginia Bridge and Iron Company brought its action against George H. Crafts in the city court of Atlanta to recover a balance of $2,850.66 alleged to be due on an account for structural material furnished to the defendant, who was a contractor and builder of bridges.   Defendant admitted the correctness of the account, but pleaded a counter-claim, by way of set-off (averring that the plaintiff had no office or place of business, or assets, in Georgia), that the plaintiff "is indebted" to defendant in the sum of $3,836 for failure to comply with certain agreements made between plaintiff and defendant as to sharing in the work of building certain bridges in the Vicksburg National Military Park, in the State of Mississippi, let out under competitive bids by the United States government.

The defendant, in his extended answer, avers that in 1903 and 1904 both plaintiff and defendant were in the business of taking contracts to build both substructure and superstructure of bridges; that plaintiff, in addition to being a contractor, was also a manufacturer of structural steel superstructures; that defendant made a special feature of building substructures, such as excavations, concrete bases, brick piers and walls, etc., commonly called the "substructure;" that this fact was known to plaintiff, who often let out the substructure work of bridges let to it by entire contract; that in January, 1903, when the United States called for bids looking to the construction of certain bridges in the Military Park, negotiations were entered into between plaintiff and defendant that they should so arrange their bids as that defendant should put in the only bid, with the understanding and agreement that plaintiff should have the steel work, or superstructure, and defendant the other work, or substructure, on whatever contracts might be awarded by the United States government to defendant; that the bid so made by defendant was partly for the use and benefit of plaintiff and at prices for the respective portions agreed on by the parties before the bid was submitted; that on February 12, 1903, the contract to build three bridges was awarded to defendant, and he at once placed an order with plaintiff for the steel work, in accordance with their agreement, but subsequently (February 16, 1903) the government, through its officers, decided to reject all the bids and call for new ones, and specified that the estimate of cost for building both substructure and superstructure should be

made separately, in each bid, these second bids to be opened April 16, 1903, in Vicksburg.

It is further averred that on March 16, 1903, the president of the plaintiff company addressed a letter to defendant, saying, "If it is your desire to take the matter up along the lines we worked together before, . . we know of no special objection;" and asked what method of procedure defendant would advise; the meaning of said letter (defendant avers) being to arrange some plan by which plaintiff and defendant could co-operate in securing one or more of the dozen bridges to be let by the government, so that one could furnish the substructure and the other the superstructure. Defendant had extended negotiations with Vernon H. Smith, the representative of plaintiff, and submitted to Smith the figures and calculations which were the basis of the bids made by plaintiff at the second letting, and under which plaintiff, in his own name, finally obtained the contracts and erected three of the bridges let by the government. Defendant avers that on the night of April 15, 1903, before submitting bids next day, in Vicksburg, plaintiff and Smith met, had a long interview, examined plans, estimates, figures, and prints; that Smith made an agreement with defendant to take defendant's estimates, submit a bid in plaintiff's name, and that defendant should have the substructure work at the figures submitted, and plaintiff the superstructure of whatever contracts might be awarded to plaintiff. Defendant, being on the ground with all equipments and implements for work (having just finished some similar work), could do the work cheaper than other contractors, and this fact was a mutual inducement for plaintiff and defendant to work in concert; and defendant then and there disclosed and turned over to the plaintiff's said agent his estimates, prices, calculations of quotations, etc., to be used by plaintiff in preparing his bid. He says, further, that immediately on said contract being made with the United States government by plaintiff to construct three bridges, known as Nos. 4, 5, and 8, in said park, defendant offered to perform his part of said contract, and demanded his right to do the substructure work at the price named for same in plaintiff's bid, all of which was denied and refused by plaintiff, who awarded the substructure to another contractor (Rubush) at a cheaper price, all to his injury and damage as aforesaid. To the defend-

9

ant's answer were attached tabulated statements showing how he would be entitled to damages, and for which he prays set-off, amounting to $3,856, besides interest from October 1, 1903.

The jury found for the plaintiff $837.75, upon which judgment was entered. Plaintiff moved for new trial on the several grounds stated in the record. At the hearing of the motion the trial judge passed the following order: "Defendant having voluntarily written off the sum of $144.23 from the set-off found in his favor, leaving the amount due the plaintiff the sum of $981.98, the motion for new trial is hereby overruled and denied."

In the voluminous record there is evidence for the defendant that the first letting, which was afterwards rejected by the government, took place as alleged; that afterwards, on the night of April 15, 1903, before the second letting next day, plaintiff's agent, Vernon H. Smith, and the defendant met in the latter's room at the hotel in Vicksburg to confer as to methods of submitting bids; that plaintiff's agent said his principal was chiefly a manufacturer of steel structural work and did not care for foundation work, though it did not refuse it; that defendant had figures made out in detail on substructure, and Smith some detailed figures on superstructure; that Smith stated that he had compared certain figures he had from his company, on both substructure and superstructure work, with the plans of the engineer on substructure work, and did not consider them reliable; that, if defendant would show him his estimates on quantities and prices, he (Smith) would use those prices in bidding on the substructure, and, if he got any contract on any of the subwork of the bridges, he would turn the subwork over to the defendant. In bidding for the entire bridge Smith agreed to put his separate bid for the subwork 1 per cent. higher than the defendant's bid, and the defendant was to put his price for superstructure higher than the plaintiff's. Both submitted bids. There was no agreement as to what should be done in the event defendant got the award for superstructure and substructure. If defendant got the award for superstructure, then he was to do it; and there was nothing said as to where he should get the superstructure materials. "I was not presumed to get the superstructure work, as I was to bid above him." Some time afterwards the defendant and Smith met in Atlanta, and for the first time the defendant learned that the plaintiff had given the

contract to Rubush. When pressed for an explanation, he said that the bid had named 4 months as the time for completion of the work, and that he had to make the contract in such a time as that the substructure work must be done in 2½ months, and that he did not know that the defendant could do it in that time; that the other party had agreed to do it in 2½ months, and he had given him the contract.

The plaintiff, in its testimony, through its representatives, denied that any such agreement as defendant alleged ever took place in Vicksburg, and testified that the first agreement, governing the first bid, came to an end with the rejection by the government of the first letting; that the naked suggestion in the first letter of its president (Robertson) to Crafts was a suggestion only, and no subsequent negotiations ever ripened it into a contract; that, after the bids had been formulated and submitted, Vernon Smith, agent of plaintiff, was informed by the government officer superintending construction that, if the time mentioned in plaintiff's substructure work bid were shortened, he could recommend acceptance as to three bridges; that said officer told him that Rubush could do it in less time; that Smith immediately went to see Rubush, and was assured that the latter could do the substructure in 2½ months; that he then shortened the time in his bid to correspond, and his bid was then recommended and finally closed by contract with the government. He (Smith) did not give the contract to Rubush at that time, but merely got a basis to rely on; had not closed with Rubush at time of meeting with Crafts at the latter's house in Atlanta, but did afterwards; was willing at that time to give the work to Crafts, if the latter had proposed to do the work in the same time as Rubush, and had also lessened his calculation as to quantities. There was some agreement among the bridge builders and contractors in the line and intendment of allowing certain work to go to certain individuals without underbidding on the part of others. Defendant did not participate in this scheme. After the rejection of the first bids there was correspondence between Crafts and Smith about certain changes in tracings and estimates which Crafts wanted to use at the second letting. Smith erased the name of Virginia Bridge Company on blue prints, and substituted the name of George H. Crafts; this because, says Smith, "I took my tracings to our draftsman and notified him, at Crafts' request, of certain

changes to be made in them." The parties differed in respect to the size and amount of steel joists, and perhaps in other respects.

The business Crafts had with the witness (Smith) when they met at the Vicksburg hotel was "to get the blue prints we had prepared for him." In turning over these plans to Crafts, he was simply carrying out the agreement of the previous letting. In case this was arranged, he (Crafts) was to use these plans in the bidding; and, in case it was so agreed, Crafts was to have this work as at previous bidding, with the understanding that he was to give "us," the steel work for the superstructure at a pound price. The pound price was not fixed by witness and Crafts that evening. It remained the same as at former letting. Smith looked at Crafts' estimates and adopted his unit of prices. His estimates did not check relatively with Smith's. The greater variance was as to bridge 5, in which there was decided difference. Witness told Crafts that he would place plaintiff's bid on substructure above Crafts', so that, in event the work was let separately, it would go to him. Witness said nothing in regard to what was to be done as to Crafts getting subwork in the event the government did not let bids separately and plaintiff got awards. "I had no contract with Crafts at all with reference to his getting the substructure at the price I bid to the government for it, in the event I was successful in my bid." It was not agreed that witness was to get any interest out of Crafts' bid, or "he out of mine," in the event Smith put in a bid. Crafts bid at the second letting, and did not use plans of the Virginia Bridge & Iron Company. Smith, for plaintiff, bid at the second letting. Crafts did not give Smith anything definite as to the time he could "do this work," except what was contained in his bid to the government. Plaintiff got the letter that Crafts wrote, after contract with Rubush, about May, agreeing to do the work in 2½ months. He refused to make that bid in Atlanta at time spoken of. The president of the plaintiff company, C. E. Michael, testified that Crafts bought other orders for bridges and paid for them without making demand or claim on account of the Vicksburg affair. As he paid for those, the plaintiff sold him still another order, the one now sued for. It also appeared in testimony that the Virginia Bridge & Iron Company and George H. Crafts were competitive bidders for the work on the bridges in controversy.

After a careful examination of the very voluminous record in this case, we are unable to find any reason for reversing the judgment of the trial court in refusing a new trial. Omitting the general grounds of the motion, we come to consider the grounds contained in the amendment thereto. The plaintiff in error insists that the court should not have charged the jury that the contract set up in defendant's plea, if proved, was a legal, enforceable contract, with sufficient consideration to support it, for the reason that the evidence did not authorize the charge, and that the evidence, if it showed anything, proved an agreement in restraint of trade and in violation of the laws relating to fair competition, and was unilateral, not mutual, and because there was no authority in the plaintiff to transfer the contract or any part thereof to any other person. We see nothing in the evidence offered by the defendant showing that the agreement was illegal or contrary to public policy. The plaintiff denied any agreement at all. The defendant's testimony only proved that, without any intention to defraud or overreach the government, the plaintiff, who did not desire the substructure work, agreed, in consideration of the use of the defendant's carefully prepared estimates on the substructure, to allow the defendant to do that portion of the work under any contract the plaintiff might receive. The contract was not unilateral, because the plaintiff (if the agreement was really made) could have compelled the defendant to do the substructure work though at a loss; and the contract, as appears in the record, forbids the transfer of the contract or any interest therein, and does not forbid the contractor from having any portion of the work done by any other person, as, for instance, by subcontract.

The next insistence of the plaintiff in error is that the court erred in submitting to the jury the question as to whether the defendant was damaged. We think, from what has been already stated, that the jury were authorized to find that a legal agreement was entered into by which Crafts was entitled to do the substructural work on any bridges contracted for in the Vicksburg Military Park; and if the evidence satisfied the jury that a profit would have resulted to Crafts by reason of that agreement, and of compliance therewith by the plaintiff company, the defendant was entitled, as damages, to any profits which would thus have accrued

to him. For this reason we think there is no merit in the seventh, eighth, and ninth grounds of the motion for new trial. ·

In the tenth ground of the motion it is insisted that the court erred in not charging the jury upon a material issue in the case, to wit: It is contended by plaintiff that, if there was a valid contract giving the defendant the substructural work of bridges 4, 5, and 8, it was based upon estimates as to the actual cost of the construction of said substructures submitted by defendant to plaintiff, and claimed by the defendant to be accurate, and upon a certain percentage added by defendant as his profit for doing the work; and plaintiff contends that it offered to let defendant do this work, provided he would do it on the percentage of profit specified by him at the time the agreement was entered into, and that the defendant refused to accept this offer of plaintiff. The plaintiff insists that the court erred in not instructing the jury that if they found that the plaintiff offered to let the defendant do the work for this certain percentage of profit, and the defendant refused to accept this proposition, the plaintiff would be relieved from liability. There is no merit in this ground of the motion, for the reason that the instructions of the court must be predicated upon evidence, and there was no evidence to authorize such a charge. In its last analysis the issue was clear-cut between the plaintiff and the defendant; the plaintiff insisting that there was no contract at all by which it was bound to let the defendant have the substructural work, and the defendant insisting that in consideration of having prepared proper estimates for the plaintiff, which estimates were of advantage to the plaintiff in securing the contract for superstructure, he was entitled to erect the substructure and receive whatever profits might accrue from the bid thus submitted by the plaintiff in reality as his agent. There was no evidence from any source that there was any agreement that the defendant should only receive a certain per cent. of profit on the actual cost, and therefore it was immaterial that the plaintiff offered to let defendant do the work upon that basis.

The request to charge, which the court refused, and which is embodied in the eleventh ground of the motion, is as follows: "I charge you, if you believe from the evidence that an arrangement was made by which the bids of the plaintiff for substructure, if successful, were to be turned over to defendant, that such an arrange-

ment was not binding on the plaintiff, because, under the contract entered into between the government and plaintiff, such agreement was impossible of performance." We think this request was prop-erly refused. An examination of the contract shows that there is nothing in its terms which prevents the contractor from procuring any portion of the work to be done by others. It is merely the man-ifest purpose of the United States government to recognize no one, in so far as its liability is concerned, except the original con-tractor, and to hold such contractor solely liable for any breach or non-performance. This, too, without question, is the construc-tion placed upon it by the government; for the evidence in this very case discloses the fact that the plaintiff, upon the suggestion of the agent of the government who signed the contract in its be-half, procured one Rubush to erect the very substructures which the defendant claimed the right to build. The same complaint substantially is made in the twelfth ground of the motion for new trial, and, for the reasons just stated, is without merit.

In the thirteenth ground of the motion the plaintiff contends that the court should have submitted to the jury the contention that the reduction of the time, in its bid, from $4\frac{1}{2}$ months to $2\frac{1}{2}$ months, was the making of a new contract, and that, even if the agreement between plaintiff and defendant had been a legal and valid one, the new agreement was not binding on defendant, and defendant had no interest therein. The court properly refused plaintiff's request upon this subject. If the defendant had any agreement with the plaintiff, it was that he was to do the sub-structure work under any contracts made by the plaintiff with the government for bridges in the Vicksburg Military Park—not on any bids made by the plaintiff. The bids might never material-ize into a contract, and the defendant testified that the agreement reached to the contract. When the chairman of the government commission declined to accept the plaintiff's bid unless the time was reduced to $2\frac{1}{2}$ months, it was the duty of the plaintiff to in-form the defendant of the change; and this the plaintiff did. Good faith required this. As no contract had yet been entered into, the defendant might then either decline to undertake the labor in the lessened time or accept the modification of the proposal. In this case the defendant, by his letter of April 28, 1903, offered to do the work in the $2\frac{1}{2}$ months; and the contract was not entered into

until May 11, 1903. This testimony is undisputed. There would be point in the plaintiff's request to charge, if the evidence had shown that defendant was only to receive the substructure under certain bids, instead of the substructural work of such bridges as the plaintiff might get to build, or if he had delayed in notifying the plaintiff that he was still ready to do the work in conjunction with the plaintiff, according to their agreement, regardless of the reduction of time to 2½ months.

After a very painstaking review of the evidence, we are unable to sustain the plaintiff's contention that the amount of damages awarded as a set-off to the defendant is excessive. We have expended much labor and time in the consideration of the tremendous record in this case, only to find, after several successive readings of the evidence, a plain conflict in the testimony, which it was the duty of the jury to settle. The charge of the court, when considered in connection with the evidence, is a clear and forcible presentation of the law applicable to the case, and is free from error of any kind.                    *Judgment affirmed.*