J. E. OWENS AND WIFE v. R. H. WRIGHT AND H. A. FOUSHEE,
TRUSTEE.

(Filed 20 December, 1912.)

1. Public Sales—Illegal Contracts—Suppression of Bidding.

An agreement to suppress bidding at a public sale is *contra bonos mores*, and the law will not assist either party to enforce such an agreement.

2. Same—Offer and Acceptance—Consideration.

As a result of an agreement between plaintiff and defendant made at a public sale, that the former should pay the latter the amount of his bid and a certain sum of money on a note he owed him, the property was knocked down to the defendant. The plaintiff was unable to comply with his part of the agreement, whereupon the defendant made a proposition that if the plaintiff paid a certain less sum by noon of that day he should have the property, which the plaintiff accepted, and before the appointed time went to the defendant to pay the agreed sum, and found that the defendant had sold to a third party: *Held*, (1) the first agreement was unenforcible, not having been complied with, and as being *contra bonos mores;* (2) the subsequent offer and acceptance made a new and separate contract, not affected by the infirmity of the first, and is enforcible.

3. Usury—Equity.

A debtor seeking the aid of a court of equity will have the usurious element eliminated from his debt only upon his paying the principal and legal rate of interest, the only forfeiture enforcible against the creditor being the excess of the legal rate.

4. Same—Interpretation of Statutes.

Our usury statute, Revisal, 3712a, does not affect the equitable principles relating to obligations concerning which the debtor invokes the equitable jurisdiction of the courts, as, in this case, injunctive relief against foreclosure of the security, and an inquiry into the status of the debt on account of the usurious charge of interest thereon.

5. Same—Mortgages.

A mortgage debtor sought the equitable relief by injunction against the foreclosure of a mortgage given to secure his note tainted by usury, and asked that the debt be inquired into on that account. The mortgaged property was sold, and after paying off prior encumbrances, a certain amount of money was available as a credit on the plaintiff's indebtedness, which pay-

ment was resisted by the plaintiff on the ground that, under our statute, Revisal, 3712a, the interest and penalty were forfeited, and the amount was therefore not due: *Held*, (1) the plaintiff having sought equitable relief, must do equity, and was chargeable with the principal of his debt and the legal rate of interest thereon; (2) the statute had no application in administering the equities between the parties.

WALKER and ALLEN, JJ., and CLARK, C. J., dissent, in part.

APPEAL by plaintiffs from *Whedbee, J.,* at July Special Term, 1912, of DURHAM.

Civil action. The complaint sets out two causes of action: (1) To recover damages for breach of contract in regard to the sale of a stock of goods; (2) to restrain the sale of plaintiffs' real estate under the power of sale, contained in a deed in trust from plaintiffs to H. A. Foushee, trustee, securing a note for $4,000, bearing interest from maturity, due twelve months after date, dated 31 August, 1909, payable by J. Henry Smith Company, a corporation, and J. E. and Emma D. Owens to J. Henry Smith and indorsed to R. H. Wright 31 August, 1909. On the back of the note are indorsed certain payments. The ground upon which the injunction is asked is that the note is usurious, and plaintiffs seek to eliminate the alleged usury and set up as a counterclaim or set-off the penalty of double the interest.

At the conclusion of plaintiffs' evidence, defendants offered none, and moved for judgment of nonsuit. His Honor rendered the following judgment:

"This cause coming on to be heard, and being heard at this term of the court, before his Honor, *H. W. Whedbee,* judge, and a jury, at the conclusion of the evidence offered by the plaintiffs, the defendant R. H. Wright, through counsel, waived any right to personal judgment against the plaintiffs, or either of them, for any balance claimed on the note, and moved judgment of nonsuit under all the evidence of the plaintiffs and the admissions of record; and, further, that the amount admitted to be in the hands of R. P. Reade, trustee, be turned over to the defendant R. H. Wright, to be applied to the note referred to in the pleadings. The motion was allowed.

"Thereupon it is ordered and adjudged by the court that the plaintiffs take nothing by this action, and pay the costs thereof, and that the defendant R. P. Reade, trustee, pay to R. H. Wright the sum of $664.25, less taxes, to be paid by the said trustee, it being the amount admitted to remain in the hands of the trustee after paying off and discharging prior encumbrances. The costs of this action will be taxed by the clerk of the court against the plaintiffs."

It appears that pending this action the real estate belonging to plaintiffs was sold under a first mortgage (that of defendant Wright being a second mortgage), and that after satisfying the first mortgage there is $664.25 only applicable to the second mortgage.

From the judgment rendered, the plaintiffs appeal.

*Guthrie & Guthrie, Manning & Everett for plaintiffs.*
*Fuller & Reade, Bryant & Brogden for defendants.*

BROWN, J. 1. In respect to the breach of contract in the sale of the goods, the facts are that the Smith Company's goods were being sold at auction by the receivers; there were other bidders at the sale; all had dropped out except plaintiff and defendant. Plaintiff Owens bid $1,465: Defendant bid $5 more. While this bid was being cried, defendant proposed to plaintiff that, if plaintiff would stop bidding and let defendant have the goods, defendant would sell them to plaintiff at the amount of defendant's bid, viz., $1,470, on condition that, in addition to said sum, plaintiff should pay defendant $800 on the note hereinbefore mentioned. Plaintiff accepted the proposition and stopped bidding, and the goods were "knocked down" to defendant.

As we understand the case, the plaintiff does not seek to enforce *this* contract, or to recover damages of defendant for its breach.

Plaintiff could not recover, if nothing else appeared, for two reasons: first, because he failed to comply with the contract himself, and, secondly, because the enforcement of such an agreement, by which bidding at public sales is suppressed, is *contra bonos mores,* and the law will not assist either party

to enforce such an agreement. *Ingram v. Ingram,* 49 N. C., 189; *Blythe v. Lovingood,* 24 N. C., 22.

The plaintiff further testifies that he endeavored to raise the $2,270 in time to pay the defendant the $1,470 for the goods and the $800 on the note, but failed to do so, and then informed the defendant that he could not comply with the agreement.

Whereupon defendant said to plaintiff on· Saturday morning: "I will tell you what I will do: if you will raise $1,880 on this thing, I will try to hold the offer open until 12 o'clock; but you must hurry up."

Plaintiff further testifies that he accepted the offer and raised the $1,880 and went to defendant before 12 o'clock Saturday to comply with the new agreement; that at 11 or 11:30 A. M. plaintiff saw defendant, who at once said: "You are too late; I have held the thing open as long as I could, and can't hold it any longer, and think I have sold it." The defendant had sold the stock between 10 and 12 A. M. that day for $2,600, to other parties.

We think this last proposition made by defendant to the plaintiff was a new proposition, independent of and disconnected with the first agreement made during the auction sale. At the time the defendant made the last proposition the plaintiff had abandoned the first, and the defendant was in the sole and undisputed ownership of the goods.

He then offered to sell them to plaintiff for $1,880, payable by 12 o'clock, and plaintiff accepted the offer. An offer to buy or sell becomes a binding agreement when the person to whom the offer is made accepts it and communicates his acceptance. 35 Cyc., 52 and 53.

This last contract has no connection with the first, which was an agreement to suppress bidding and void, and can be enforced without calling in the aid of the first or illegal contract.

"A new contract, founded. on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful." *Marshall, C. J.,* in *Armstrong v. Toler,* 24 U. S., 257.

The subject is discussed at length in *Electrova Co. v. Insurance Co.,* 156 N. C., 234, and many authorities cited; and in *Jewelry Co. v. Joyner,* 159 N. C., 644, which are cases in point.

2. The plaintiffs Owens and wife, Emma, also aver in their complaint that the $4,000 note hereinbefore described and secured in the deed in trust to Foushee is usurious, and they pray affirmatively "that the defendant H. A. Foushee, trustee, be restrained and enjoined from selling the house and lot of plaintiff Emma D. Owens on the first day of July, 1911, as he has advertised so to do, until it can be inquired into and determined by the court what amount, if any, is justly due and owing by the plaintiffs on the note secured by said deed of trust or mortgage."

His Honor seems to have held with plaintiffs that the note contained certain usurious charges, and eliminated them, but in adjusting the matter rested his calculation upon the decision of the Court in *Churchill v. Turnage,* 122 N. C., 426. To this ruling plaintiffs except and ask us to overrule that case.

The principle settled by that case is, that a debtor seeking the aid of a court of equity will have the usurious element eliminated from his debt only upon his paying the principal and legal rate of interest, the only forfeiture enforced against the creditor being the excess of the legal rate. This case was subsequently cited and approved in *Cheek v. B. and L. Association,* 127 N. C., 122.

In *Churchill v. Turnage* no novel principle was promulgated, for the opinion recognizes that "the precedents are both *numerous* and *uniform.*"

The same principle was applied in 1847 in *Ballinger v. Edwards,* where it is held in an opinion by *Chief Justice Ruffin* that "the statute of usury is as binding in a court of equity as at law, except in cases where the borrower asks the assistance of a court of equity, and then the court will compel him to do equity by paying the principal and the legal interest."

To the same effect are the cases of *Gore v. Lewis,* 109 N. C., 539; *Burwell v. Burgwyn,* 100 N. C., 389; *Purnell v. Vaughan,* 82 N. C., 134; *Beard v. Bingham,* 76 N. C., 285.

In *Purnell v. Vaughan, Chief Justice Smith* says: "Equity will relieve against usury only upon the borrower's paying the principal sum loaned and legal interest."

In *Simonton v. Lanier,* 71 N. C., 498, *Bynum, J.,* says: "As the defendants came into this court to ask favors, and this is a court of equity as well as law, they will be required to do equity, that is, to pay the debt and legal interest thereon."

This principle of equity has been so thoroughly engrafted upon our jurisprudence that we do not feel disposed to disturb it. It applies alike to all classes of persons, married or single, and whether principal or surety.

The statute of 1907, chapter 110, Pell's Revisal, 3712a, has been called to our attention, but an examination of it shows that it has no bearing whatever upon this case, and does not change the principles of equity declared and enforced, in the numerous cases we have cited, for more than half a century. This principle which has been enforced so long in this State is universally followed in other jurisdictions. The Supreme Court of the United States, in passing on the National usury law applicable to National banks (a statute almost exactly like ours), has held in a great many cases that, "It is an established principle of equity jurisprudence that he who seeks the aid of equity to be delivered from usury must do equity by paying or offering to pay the principal and lawful interest upon the money borrowed as a condition of granting the relief asked." Ency. of Supreme Court U. S., 850. In note 69 will be found collected a large number of cases from that Court recognizing and enforcing that principle.

For the reasons given, we are of opinion upon the question of usury his Honor's ruling was correct and must be affirmed.

Upon the other cause of action, relating to the breach of contract in the sale of the stock of goods, there must be another trial.

The costs of this Court will be paid by defendant.

The judgment of nonsuit is set aside and the cause remanded to be proceeded with in accordance with this opinion.

Error.

WALKER, J., dissenting in part: I concur in so much of the Court's opinion as relates to the contract between plaintiff and defendant R. H. Wright, for the purchase of the goods formerly belonging to Smith Company, and sold by the receivers, as my view is that there was evidence of a breach of that contract entitling plaintiff to his damages for the same; but on the other question, as to the usury and the plaintiff's rights in that respect, the view which I take of the law compels me to dissent.

I do not deny that there are a few precedents which apparently support the conclusion reached by the Court, but they do not take into account the provisions of our statutes which bear upon the matter. The Revisal, sec. 1951, declares that "the taking, receiving, reserving, or charging a greater rate of interest than 6 per centum per annum, either before or after the interest may accrue, when knowingly done, shall be a forfeiture of the entire interest which the note or other evidence of debt carries with it," and "if the greater rate of interest has been paid, the person by whom it has been paid may recover back twice the amount of interest so paid." Where an action is brought to recover the amount of the note, the payee is allowed by the same section to set up the penalty as a counterclaim. We have held, at this term, that the legal effect of this statute is to make the loan one without interest, where usurious interest was reserved, and of course it becomes so as soon as the note for the loan is executed. *Ward v. Sugg,* 113 N. C., 489; *Ervin v. Bank, ante,* 42. In *Smith v. B. and L. Association,* 119 N. C., 249, it is said: "Where usurious interest is charged, all interest is forfeited, and the legal effect of the contract being simply a loan without interest, all payments, however made, must be credited on the principal, and, in addition, the borrower is entitled to recover, or have credited on the debt, double the amount of payments made as interest within two years prior to action brought." This being so, when the present suit was brought, plaintiff only owed the defendant Wright the amount of the note less the payments, for, as we have seen, these must be applied to the reduction of the principal, and, besides, it must be further reduced by the amount of

the penalty. But it is said that we are in a court of equity, and as plaintiff has asked for equitable relief, that is, for an injunction to stop the sale by the defendant R. H. Wright, under the mortgage, and that as "he who asks equity must do equity," the plaintiff, contrary to the very words of the statute and also its meaning, as a condition of granting relief, must pay the principal, with legal interest, forgetting that there is no legal interest, as the Legislature, in this very statute, has plainly said there shall be none. This is penalizing the plaintiff instead of the defendant, and entirely reversing the mandate of the law, which, of course, is a repeal of it. No precedent, and especially no baldly erroneous precedent, can compel me to disregard and set ·at naught the clearly expressed will of the people as recorded in our statute. There is no law requiring this Court to do that. If this Court has decided contrary to the statute and thus repealed it, we should retrace our steps, and reinstate it as speedily as possible. The rule of *stare decisis* is not imperative or inflexible, and it has been said that the maxim should not be allowed to stand as an absolute bar in the way of a reëxamination of legal questions previously decided by the same court, if improperly determined, and especially where the decisions reviewed have not passed into a settled rule of property or contract, so that parties may thereafter have been misled in their business transactions. *Colorado Seminary v. Board of Commissioners,* 71 Pac., 410 (30 Col., 507). The Court said, in that case, that it had gone as far as any other appellate tribunal in maintaining the maxim of *stare decisis.* It will be found that this rule, the great efficiency of which is admitted, is confined to decisions which establish rules of property or of contract upon which parties may reasonably have relied in making contracts or in acquiring titles. *Hill v. R. R.,* 143 N. C., 539. *Lord Mansfield* stated it, with its limitations, in *Wyndham v. Chetwood,* 1 Burrows, 419, as follows: "When solemn determinations, acquiesced under, have settled precise cases and become a rule of property, they ought for the sake of certainty to be observed as if they had originally formed a part of the text of the statute," and the same was said of it in our own cases of *Long v. Walker,* 105 N. C., 109;

*Grantham v. Kennedy,* 91 N. C., 151; *Kirby v. Boyette,* 118
N. C., 244; *Young v. Jackson,* 92 N. C., at p. 148. "Where
judicial decisions may fairly be presumed to have entered into
the business transactions of a country and have been acted
upon as a rule of contracts and property, it is the duty of the
court, on the principle of *stare decisis,* to adhere to such de-
cisions without regard to how it might be inclined to decide
if the question were new. And this rule obtains although the
court may be of the belief that such decisions are founded upon
an erroneous principle and are not sound, for when parties
have acted upon such decisions as settled law, and rights have
been vested thereunder, their inherent correctness or incorrect-
ness in the abstract are of less importance than that the rule of
proprty so established should be constant and invariable." 11
Cyc., 755. The reason of the rule of *stare decisis* is stated in
*Hill v. R. R., supra,* with a citation of many cases exemplifying
it, and showing, I think, conclusively that it does not apply to
a case like this. I believe no court has applied it to any case
where it was not found that a reversal of the former decision
or decisions would unsettle titles or prejudice parties who have
made investments or entered into contracts in reliance upon
the former adjudication as correct and final. And why should
the rule be extended farther than this? There is no construc-
tion of a constitution or a statute involved. The former de-
cisions have simply nullified the statute, and there was no at-
tempt to construe, otherwise the result of those cases would
have been different. If money-lenders have risked their money
upon loans drawing usurious interest, it is their own fault, for
no man has a license or a vested right to violate the law. A
reversal of former decisions will therefore have no harmful
effect. A few of them may be caught in the act, but they are
mere lawbreakers and entitled to no consideration from the
court—simply. because, as to this kind of transaction, they are
not within the pale of the law. To visit them with the penalties
of the law would be but enforcing the will of the Legislature
and the policy of the State, as expressed in this statute. It
would be a most wholesome decision and a return to the true
meaning of the law. If this question were *res integra,* I am

quite sure it may safely be said that this Court would be unanimous in the opinion as to the former decisions being erroneous, and plainly so in view of the unambiguous wording of the statute. I refer to the cases cited in the opinion of the Court. There is one recent case apparently to the contrary. *Ward v. Sugg,* 113 N. C., 489. See, also, dissenting opinion of the present *Chief Justice* in *Churchill v. Turnage,* 122 N. C., 426, where the subject is ably and learnedly discussed and the authorities cited.

This is now only a proceeding to determine how the parties will share in the surplus of the fund realized from a sale of the land under the first mortgage, and for that purpose to ascertain how much is due by the plaintiff to the defendant R. H. Wright. Besides, Wright is claiming usury in this suit, that is, the sum of $1,478.44, as of 1 July, 1911, and he prays judgment for this amount in his answer. Upon the admitted facts, there is no calculation authorized by law by which he would be entitled to this amount. The note was for $4,000, and did not carry interest until twelve months after its date. Plaintiff testified—and his testimony must be taken as true, as there was a nonsuit—that he paid $2,987.44 on the note, which would leave $1,012.56, without counting any interest, for the note did not bear interest until after its maturity, 31 August, 1911, and the payments were made as follows:

| | |
|---|---:|
| 1909. | |
| October 6 ........................$ | 150.00 |
| December 4 ........................ | 100.00 |
| December 10 ........................ | 50.00 |
| 1910. | |
| January 14 ........................ | 150.00 |
| April 4 ........................ | 1,950.00 |
| 1911. | |
| January 17 ........................ | 197.44 |
| 1909. | |
| August 31 ........................ | 390.00 |

$2,987.44

So that, leaving the statute, Revisal, sec. 1951, as construed by us, out of consideration, there would be only a very small amount of interest to be added to the principal after deducting the total of the payments. But the statute positively declares that where unlawful interest is reserved, the note shall not carry any interest at all; it is, therefore, a noninterest-bearing security. Even if Wright is not to be regarded as the original payee—and I do not think there can be any doubt that he is to be so regarded, upon the facts, as they now appear—he took the note with full knowledge of the usury, and therefore, as we will see, the principal of the note must be reduced by the payments and double the amount of the interest. The statute expressly makes the penalty the subject of a counterclaim. Revisal, sec. 1951; *Cobb v. Morgan,* 83 N. C., 211, and it was held in *Harris v. Burwell,* 65 N. C., 584, overruling *Neal v. Lea,* 64 N. C., 678, that any counterclaim, good under the law against the original payee of the note, shall be good also against his assignee, or indorsee, especially if he purchased the note with notice of the counterclaim. That case construed Code, sec. 177; Revisal, sec. 400. So that in any view of the transaction, R. H. Wright, who knew all the facts, took the note and held it subject to any defense or counterclaim of the makers. R. H. Wright, if not in law the original payee, took the note well knowing that, under the law, it did not bear interest, and I do not know of any case that holds that, under such circumstances, the right to interest can be revived. There is no authority which holds that this Court can charge interest upon a note which, at the time it was bought by the holder, did not bear interest. It has no more power to do so than it would have if the note, on its face and by agreement of the parties, did not carry interest. In my statement of the payments made by plaintiffs to Wright or for him, and of the balance due on the note, we have allowed the plaintiff only for actual payments, without regard to the provision of the statute doubling the amount of the interest paid. If this is done, the credit as of 3 August, 1909, should be $780, which would reduce the balance to $622.56. But there should be a still further reduction, for R. H. Wright paid only $3,660 for the note, and as he is really

and in law the original payee, the note having been made with the understanding that he should be the owner of it, that amount is the legal principal. It is all that plaintiff ever received, and that, in law and in good morals, is all defendant can justly demand. Deducting from this principal the payments, as above stated, that is, $2,987.44, and there is left $612.56, which is $51.69 less than the amount ($664.25) in Mr. Reade's hands, as trustee under the first mortgage, for distribution. But if we take from this amount the sum of $390, which should be deducted if the penalty is allowed, as the payment of $390 made 31 August must be doubled, we have a balance of $222.56, much less than the amount in the hands of the trustee. So that in any view, starting with a principal of $4,000 and deducting only the payments, but bearing in mind that the note, by its terms, did not bear interest for a year or until after its maturity, we find that defendant R. H. Wright demanded usury when he filed his answer in this case. Deducting the payments during the first year and then allowing him interest on the balance from 31 August, 1910, to 17 January, 1911, when the last payment was made, and then taking off that payment, and there is left $1,040.21, and yet in his answer he demands judgment "that he recover the sum of $1,478.44 and interest from 1 July, 1911," and that the $664.25, the amount in Mr. Reade's hands, be applied *pro tanto* to its payment. In the case of *Manning v. Elliott*, 92 N. C., 48, *Justice Merrimon*, referring to the maxim that he who asks equity must do equity by paying the principal and legal interest, says it does not apply to a case like this one. "This rule, however, does not apply to the case of a lender of money, who comes into court asking the enforcement of his usurious claim; he would encounter another maxim, which requires him who would sue in a court of equity to come with clean hands."

What are the facts of this case? It must be remembered that the court withdrew the case from the jury and decided, upon the testimony, that plaintiff was not entitled to recover anything, and then entered judgment of nonsuit. This entitles plaintiff to have us take the most favorable view of the evidence in his behalf. When this is done, it appears plainly that the

transaction which culminated in the execution of the note and mortgage, while conducted in the name of J. Henry Smith as payee, was in fact intended for the benefit of the defendant R. H. Wright, and he was the real payee. There is plenary evidence and at least some evidence to show that the name of Smith was merely used that defendant might escape the penalties of the usury. The form of the transaction was merely colorable and intended to disguise the real nature of the transaction. Plaintiff testified that R. H. Wright was present all the time, and his attorneys drew the papers, and they were submitted to Wright for his approval before they were signed, and he actually approved them with certain interlined amendments. Wright went with Owens to see the house and lot of Mrs. Owens, which was to be mortgaged to secure the note, and he told Owens that if he would pay the interest in advance ($240) and convey to him the small triangular lot in Durham, valued by Wright at $50, and also pay him $100 in money as a bonus, or as usury, to call it by its right name, he would buy the note from Owens. This was before the note was executed. The money was paid and the lot conveyed at the request of Wright. J. E. Owens paid the $340 to J. Henry Smith, not for himself, but for Wright, according to Wright's instruction, and Wright was present when the payment was made, which was shortly after the execution of the note, but Wright had said it would be all right to wait a day or two. The note was transferred to Wright on 31 August, the day it was given. There was evidence to show that R. H. Wright was the master spirit in the transaction. He dominated the situation and was making an advantageous contract for himself, and not for Owens or Owens & Co. The note was really made to him. Although in the name of Owens, it was for his use and benefit. He is, therefore, to be regarded, in law, as the real payee. He sought, in the beginning, to enforce payment for the full amount. I think, as matter of law, he must be charged with all the usury. (*Bynum v. Rogers*, 49 N. C., 399; Pell's Revisal, sec. 1951, and cases in notes); but the evidence certainly entitled the plaintiff to have the jury pass upon the transaction in order that they might say whether or not it was usurious as to Wright. 39 Cyc., 1052,

1053, 1054; *Yarborough v. Hughes,* 139 N. C., 199; *Miller v. Insurance Co.,* 118 N. C., 612. In law, he must be considered as the original payee, because he virtually assumed that relation to the note by his dealings in respect to it. The form of the transaction is not regarded so much as the substance, and when we view it as it really was and as it was intended to be, it reeks with usury. The law will penetrate beyond the covering of form and look at the substance and the matter as it really, and in essence, is, however it may seem to be. The outward semblance is of no moment; it is the true character of the thing that determines the rights of the parties. *Gay v. Parpart,* 106 U. S., 699. Look at it but for a moment. R. H. Wright plans the entire scheme. He receives interest ($240) in advance, when no interest was payable until after the first year. In addition to this, he gets $100 as a bonus and a lot worth, by agreement, $50. In other words, they started out by extorting from this plaintiff, who was in necessitous and straitened circumstances, as unlawful interest, $390, and this was done twelve months before any interest began to accrue upon the note. How will we ever enforce the beneficent provisions of this statute if such transactions can be conducted with impunity? Every money-lender, especially every usurer, always secures himself by a mortgage or by collaterals, and the poor debtor must always resort to the court to stay his mailed hands until the matter can be investigated; but for this he must pay the penalty of forfeiting his rights under the statute, Revisal, sec. 1951, and, strange to say, the very law that gives the right is made to take it away, simply because the debtor seeks to vindicate it in the courts, the only place where he can ever expect to get relief. Is not this a complete reversal of the maxim that where there is a right, there is always a remedy for its enforcement (*ubi jus ibi idem remedium*)? Mr. Broom in his excellent and standard work on Legal Maxims (6 Am. Ed.), marg. p. 192, in explaining this maxim, says that *"jus"* signifies "the legal authority to do or demand something," while *"remedium"* is defined to be the right of action, or the means given by the law for the recovery or protection of the right, and that whenever the law gives a right, it at the same time gives a complete remedy for

the same (*lex semper dabit remedium*). "If a man," says he, "has a right, he must, it has been observed in a celebrated case, have a means to vindicate and maintain it, and a remedy if he is injured in the exercise and enjoyment of it; and, indeed, it is a vain thing to imagine a right without a remedy, for want of right and want of remedy are reciprocal." I do not think the courts can annex a penalty, or a forfeiture of a statutory right, to the bringing of a suit, by a party aggrieved, for the vindication or protection of that right. Plaintiff is appealing to the court, not for its favor, nor is he invoking the exercise of its discretion, but is asserting, in the legal and rightful, and in the only way, to enforce his statutory right. There is no court of chancery now, as there was in England, where this peculiar doctrine, set up against this plaintiff's claim and to bar his plain legal right, originated. There is but one kind of court with us, where all kinds of rights are administered. Nor is the writ of injunction now an equitable remedy. It is a legal remedy given by the statute, Revisal, sec. 806, as much so as is arrest and bail, claim and delivery, and attachment. They are only provisional or ancillary remedies. Code, Title IX, 1 vol., p. 110, and *legal* remedies. Plaintiff was, under this statute, entitled to the injunction unconditionally, as a matter of right, and not as a favor from the court. The ancient chancery court, perhaps, had the right to annex a condition to the exercise of its jurisdiction, but not the modern court of law, governed as it is by the mandate of the statute.

It seems to have been overlooked, that this suit is also for the recovery of the penalty, and the equity rule, as it is called, does not apply. *Cheek v. B. and L. Association,* 127 N. C., 121. Nor does it apply where the usurer actually seeks a foreclosure or, as in this case, to recover his debt out of the proceeds of a sale made under a prior mortgage, which is practically the same thing. *Bennett v. Best,* 142 N. C., 168; *Moore v. Woodward,* 83 N. C., 531; *Arrington v. Goodrich,* 95 N. C., 462; *Gore v. Lewis,* 109 N. C., 539. The plaintiffs in this case are not asking for any equity, and, therefore, cannot be required to do equity, and besides, there is no equity to do, unless it can with reason and justice be said that, in order to avail himself of his

legal and provisional remedy given by the statute, Revisal, 806, to prevent his creditor, by a sale under the power contained in the mortgage, from collecting usurious and extortionate interest on his debt, he must surrender valuable legal rights which are given by the law in the execution of a sound public policy. *Atkins v. Crumpler,* 118 N. C., 532; *Smith v. B. and L. Association,* 119 N. C., 249; *Cheek v. B. and L. Association,* 126 N. C., 242; *Ward v. Sugg,* 113 N. C., 489; *Moore v. Beaman,* 112 N. C., 558. Is this an equity? The statute says peremptorily that there must be no interest. We say there must be the legal rate, when there is no rate at all on a usurious contract, and it is a misnomer to call what is now allowed as interest the *legal* rate. Besides, in his answer, defendant seeks to recover nearly $1,500, which is more, in any view, than he is lawfully entitled to receive, and it can make no difference, in law, whether he seeks to recover it as plaintiff or as defendant. The decision of the Court concedes to the debtor, in theory, everything the statute gives him, until he attempts to assert his statutory right in practice, and against him who violated it, when he loses it at once. Does this not make a dead letter of the statute? It is putting a premium on usury and so intrenches the usurer by compelling the oppressed debtor to do what is called equity, that the former risks nothing in exacting unlawful interest, but is protected in his effort to consummate the wrong. If this be the correct rule, the Legislature will, perhaps, by amendment, make its intention so clear that this anomaly in the law will not again be presented. The fact that the defendant remitted the excess over the amount in the trustee's hands plays no part in this case. It was too late to repent or change his mind. The *locus penetentiœ* was gone. The wrong had already been committed. His Honor proceeded upon the wrong theory, for if the calculation had been properly made, the plaintiff was entitled to a large part, if not all, of the fund in Mr. Reade's hands.

If the former decisions apply to this case, they should be overruled, so that a borrower may not be told that as soon as he attempts to enforce his rights he will lose them. I think the new trial should extend to the usurious transaction, and the law correctly administered in regard to that branch of the case.

CLARK, C. J., concurring in the dissent of WALKER, J.: Revisal, 1951, provides that "taking or charging a greater rate of interest than 6 per cent per annum, either before or after the interest may accrue, when knowingly done, shall be a forfeiture of the entire interest which the note or other evidence of debt carries with it, or which has been agreed to be paid thereon. And in case a greater rate of interest has been paid, the person or his legal representatives or corporation by whom it has been paid may recover back twice the amount of interest paid."

This statute makes no suggestion that the debtor shall not have this remedy when the creditor shall secure his debt by a mortgage and the debtor shall be forced to take action to prevent sale under the mortgage, and tenders the amount legally due according to the statute. Indeed, this Court wrote such exception into the statute in *Churchill v. Turnage,* 122 N. C., 426, but that case has been cited only once since (and then it was distinguished), in *Cheek v. Association,* 127 N. C., 122. On the other hand, in Revisal, 3712a, which has been enacted since *Churchill v. Turnage,* being chapter 110, Laws 1907, it is provided that when a mortgage is given on household furniture the penalty is incurred. It was not intended, however, to restrict the remedy to mortgages in such cases, but merely to emphasize the remedy, for Revisal, 1951, contains no exception of any kind.

I concur with *Mr. Justice Walker* that the statute should be followed, and not the exception engrafted upon it by judicial legislation in *Churchill v. Turnage, supra.*

ALLEN, J., dissenting: I concur in the conclusion of the Court as to usury, but do not think what occurred on Saturday between the plaintiff and defendant made a new contract. Under the first agreement, which the Court holds to be invalid, the plaintiff was to pay the defendant $1,470 for the goods and $800 on a note. He failed to get the money, and told the defendant he could not do so. The defendant then said: "I will tell you what I will do: If you will raise $1,880 on this thing, I will try to hold the offer open until 12 o'clock; but you must hurry up."

This cannot, I think, be a new contract, and it amounts to no more than changing the amount to be paid in cash under the original contract.