[No. 18822. Department One. December 3, 1924.]

FRANK O. DOLE, *Respondent*, v. CITY OF ABERDEEN *et al.*, *Appellants.*[1]

MUNICIPAL CORPORATIONS (523)—PUBLIC DEBT—BONDS—SUB-MISSION TO POPULAR VOTE—UNRELATED MATTERS. The issuance of municipal bonds for the acquisition of waterworks for a public water supply has no relation to the acquisition of an electric power plant for furnishing light and power, and the submission of the two projects to the voters as a single proposition is not warranted under Rem. Comp. Stat., § 9488, notwithstanding both will be accomplished through the acquisition of a site and the impounding of water by a dam, where approximately one-half of the $2,000,000 estimated cost would be expended in the construction of the power plant.

Appeal from a judgment of the superior court for Grays Harbor county, Wilson, J., entered July 26, 1924, upon findings in favor of the plaintiff, in an action to restrain the issuance of municipal bonds. Affirmed.

*A. Emerson Cross, Bruce C. Shorts,* and *John C. Hogan,* for appellants.

*Theodore B. Bruener* and *W. H. Abel,* for respondent.

PARKER, J.—The plaintiff, Dole, a taxpayer and elector of the city of Aberdeen, commenced this action in the superior court for Grays Harbor county, seeking an injunction restraining that city and its officers

[1]Reported in 230 Pac. 401.

from proceeding in pursuance of the provisions of its ordinance No. 2307, and the vote of the electors of the city therein provided for, with the construction of extensions to its present waterworks and the acquisition of an electric power plant, and the issuance of bonds therefor, all as a single proposition. A trial upon the merits resulted in the awarding to the plaintiff of injunctive relief, as prayed for, and the entry of a formal judgment accordingly by the superior court, from which the defendant city and its officers have appealed to this court.

The trial court granted the injunction upon the theory that the assumed single project was in fact and in law two projects, that is, that the proposed extension of the waterworks and the proposed acquisition of an electric power plant were two projects, and that the submission to the electors of the city of the question of their construction and the issuance of bonds therefor as a single proposition, as was done, constituted an unauthorized and void proceeding.

The controlling facts, as we view them, may be summarized as follows: The city has, for many years, owned and operated its own waterworks, and thereby been engaged in supplying itself and its people with water. Its source of supply is from the waters of the Wishkah river, several miles north of the city. The city does not own or operate any electric or power plant and is not engaged in furnishing itself or its people with any electric light or power from any source. Several miles north of the city's present source of water supply, is a location upon the Wynooche river, a stream considerably larger than the Wishkah river, well suited to the development by water power of a large amount of electric energy; that location also being suited to the impounding and diverting of a por-

tion of the waters of that river into the head waters
of the Wishkah river, and thereby increasing the city's
present water supply.

During the summer or early fall of 1923, the city au-
thorities, being of the opinion that it was becoming
necessary for the city to look to an increase of its
water supply, and also being of the opinion that it was
desirable for the city to acquire an electric power plant
from which it should furnish itself and its people elec-
tric energy for light and power purposes, entered upon
an inquiry as to the feasibility of the construction of
a dam in the Wynooche river at the above mentioned
location, looking to the raising of its waters in aid of
diverting a portion thereof into the head waters of the
Wishkah river to increase the city's water supply, and
the constructing of a water power electric plant below
the dam to generate electric power by the fall of the
water so raised by the construction of the dam, and
furnishing therefrom electric energy for light and
power to the city and its people.

Becoming satisfied, after due investigation, as we
shall for the present assume, that such a proposed
project was feasible and practical, the city council
passed an ordinance, No. 2307, which was approved by
the mayor. Following several whereas recitals touch-
ing the necessity of acquiring an increased water sup-
ply and the desirability of acquiring an electric power
plant for the furnishing of the city and its people light
and power, the ordinance, in so far as we need here
notice its terms, provides:

"Section 1. That the said demands and require-
ments for water and electric energy make it necessary
and advisable that said city make additions and better-
ments to and extensions of its existing municipal water
works system and acquire and construct a municipal

light and power plant and system, all as herein provided.    .    .    .

"Section 2. The estimated cost of the system or plan hereinabove referred to and hereinafter more particularly set forth, is hereby declared, as near as may be, to be the sum of $2,000,000.00.

"Section 3. The City of Aberdeen and its corporate authorities hereby specify and adopt the system or plan hereinafter set forth for the making of certain additions and betterments to and extensions of the existing municipal water works system of said city, and for acquiring and constructing a municipal light and power plant and system for the purpose of furnishing to said city and the inhabitants thereof, and any other persons, with electricity for the public uses and purposes of lighting, heating, fuel and power, to-wit:

"That said City construct a masonry dam across the Wynooche river at a suitable dam site to be acquired in Sec. 12, Township 21 North Range 8 West, W. M., which dam shall be approximately 240 feet high, for the purpose of impounding the waters of said river in the river basin above said dam commonly known as the 'Weatherwax Basin.'

"That said City acquire all of the lands and property located in said basin which will be submerged by the impounding of such waters and which lie below a contour line drawn at elevation 765 feet above mean sea level.

"That said City divert water from said impounding basin by means of pumps, flumes, conduits, tunnels and pipe lines from a point within said impounding basin on Larson Creek to a distance of approximately one and one-half miles into the headwaters of the Wishkah River at a point in Sec. 16, Township 21 North Range 8 West W. M. and above the present headworks of the existing municipal water works system.

"That said City construct on a suitable site to be acquired in Section 12, Township 21 North Range 8 West, W. M., a power house and install therein all necessary and suitable generators, switch boards, water wheels and other electrical and mechanical appliances and equipment for the generation of approximately

34,000 horse power, based upon a load factor of 44%, of electric energy through the use of water to be conducted from said basin by means of pipe lines, tunnels, penstocks and other suitable means, to said power house over rights of way to be acquired.

"That said City construct upon rights of way to be acquired suitable transmission lines for the purpose of transmitting electric energy from said power house to and within the corporate limits of said city;

"That said City acquire or construct within said City suitable sub-stations and distributing systems;

"That said City construct on suitable sites to be acquired all other necessary buildings, structures, pole lines, transmission lines, pipe lines, flumes, conduits, tunnels and other electrical and mechanical equipment and devices necessary or incident to make the project complete."

Section 4 provides for the issuance of $2,000,000 of bonds, or so much thereof as may be necessary, to finance the project. Section 5 provides for the creation of a fund from the revenues of the project and from some other sources to pay the interest upon and principal of the bonds. Section 6 provides for submission, as a single proposition, of the question of the adoption of the entire scheme and project for approval or rejection to the voters of the city. An election was accordingly held. The proposition so submitted was approved by the voters by a vote of 1092 votes for and 992 against. While the $2,000,000 estimate of the cost of the whole project is not, by the terms of the ordinance, separately stated, as to the amount thereof which will be necessary to extend the waterworks as proposed, and the amount thereof which will be necessary to acquire the power plant as proposed, it is plain, from the evidence of the preliminary estimates and information upon which the council acted, that approximately $1,000,000 of the total $2,000,000 estimated cost will be necessary to acquire the proposed

power plant for the furnishing of the city with light and power, and that the extension of the waterworks alone as proposed could be efficiently accomplished by the elimination of this approximately one-half the estimated cost of the whole project. That the power plant could be acquired independent of the extension of the waterworks as proposed, at a cost of one-half of the whole estimate, does not seem so clear. But we think it at least clearly appears that the proposed power plant is not a mere incident to the proposed extension of the waterworks, nor is the proposed extension of the waterworks a mere incident to the proposed power plant.

It has become the settled law of this state, as it generally prevails elsewhere, that unrelated municipal improvement projects such as are necessary to be sanctioned by a vote of the electors before being constructed or acquired, cannot be lawfully submitted to a vote of the electors other than as separate propositions enabling the electors to vote upon each separately. The law upon this subject was reviewed at considerable length and this holding announced in *Blaine v. Seattle,* 62 Wash. 445, 114 Pac. 164, Ann. Cas. 1912D 315, which holding has not been departed from by this court since the rendering of that decision. Among the several proposals for the construction of municipal improvements, there drawn in question, which the city officers attempted to submit to the electors for approval, all as a single proposition, was the building of fire houses and a hospital. This was held to be illegal and void as an authorization for the making of such improvements, because being submitted to the electors as a single proposition without opportunity to vote upon each separately. The reasons supporting this view of the law need not be

restated here. Speaking generally, it seems to us that the maintenance of waterworks by a city for the furnishing of water to itself and its people, has no more relation to the maintenance of an electric power plant by the city for the furnishing of light and power to itself and its people than the maintenance of a fire house has to the maintenance of a hospital. The difference between the purposes to be accomplished and the services to be rendered is, it seems to us, equally plainly discernible in each case.

Now it may be that the legislature could authorize the submission to the electors of a municipality of the question of making two or more unrelated municipal improvements as a single proposition. Indeed, some of the decisions here invoked by counsel for the city seem to have been in a measure influenced by statutory provisions which seem to sanction such submission to the electors in the particular case, but we do not think our statutes sanction any such submission. It is apparent that the extension of the waterworks and the acquisition of the power plant here in question are attempted to be brought about under the provisions of our public utilities statute found in § 9488, *et seq.*, of Rem. Comp. Stat. [P. C. § 1214]. That section reads in part as follows:

"Any incorporated city or town within the state be, and hereby is, authorized to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate waterworks, within or without its limits, for the purpose of furnishing such city or town and the inhabitants thereof, and any other persons, with an ample supply of water for all uses and purposes, public and private, including water power and other power derived therefrom, with full power to regulate and control the use, distribution and price thereof;     .     .     .     to construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants and

facilities for the purpose of furnishing such city or town and the inhabitants thereof, and any other persons, with gas, electricity and other means of power and facilities for lighting, heating, fuel and power purposes, public and private, with full authority to regulate and control the use, distribution and price thereof, together with the right to handle and sell, or lease, any meters, lamps, motors, transformers and equipment or accessories of any and every kind, necessary and convenient for the use, distribution and sale thereof;

.   .   .   ,,

Other paragraphs of that section authorize cities and towns to acquire and maintain plants for the manufacture of stone and asphalt products to be used in street construction work; to acquire and maintain public markets with storage plants incident thereto; and, to acquire and maintain street railways; each of these powers being stated in the section in paragraphs separated by semi-colons as the above quoted powers are stated in the section. This manner of separately stating and enumerating the different powers conferred upon cities and towns by this section, to our minds, all but conclusively shows that the legislative intent is to treat each so stated power as unrelated to the others. It may be suggested that the words "including water power and other power derived therefrom" near the conclusion of the first above quoted paragraph in which is found the power to acquire and maintain waterworks, suggest some relation to the acquiring and maintaining of plants for generating electric power to furnish light and power. The above quoted words from the first paragraph might furnish some room for so arguing if it were not for the fact that the power to acquire and maintain and operate plants for the furnishing of light and power was not specifically and expressly given in the second paragraph above quoted.

It seems to us that, reading these two paragraphs together, it must be held that the words "including water power and other power derived therefrom" found in the first paragraph relate only to power to be acquired incident to the furnishing of the city with water; that is, power which may be necessary to the conveying of the water to and its distribution in the city or town. Other sections of our public utilities statute, following the section above quoted from, provide for the manner of submitting to the electors the question of the acquisition and extension of public utilities and the financing of the same by the issuing of bonds chargeable against such utilities. But in none of these provisions is there a suggestion that unrelated public utility projects shall be submitted to the electors for approval or rejection other than as separate propositions.

We proceed now to notice our decisions rendered later than the one in *Blaine v. Seattle* above noticed, all of which are at least in some measure invoked by counsel for the city in support of their contention that this proposed extension of waterworks and acquisition of a power plant are in effect one project capable of being submitted to the electors as a single proposition.

In *Blaine v. Hamilton,* 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577, there was drawn in question the validity of an election authorizing a number of unit improvements, all looking to the general improvement of the harbor of the city of Seattle. While it was recognized that these proposed improvements were separate, in the sense that they were separate in specific accomplishment, they were but units of one comprehensive improvement, to wit, the improvement of the harbor. In so holding, Judge Gose, speaking for the court, observed:

"We are, therefore, committed to the view that distinct, unrelated, and independent objects or purposes must be separately submitted by the ballot.

"Council for the appellants, in his oral argument, stated that the true test of whether a proposition is single is, will it stand alone. This, we think, is but one of the tests of singleness, and might often be no test at all. The true criterion is, are the several parts of the project so related that united they form in fact but one rounded whole. Either of two converging highways, or either of two public highways terminating upon a highway common to both, would stand alone, but there are few cases which would hold that bonds were invalid where the two were submitted as a single project. Again, we have no doubt that a proposition could be submitted as a unit for bonding the city of Seattle for the construction of one schoolhouse on Capitol hill and another on Queen Anne; or for the construction of isolation hospitals at points remote from each other, if the law permitted bonds for that purpose."

The improvements there drawn in question, if they are to be spoken of in the plural sense, were not unrelated. They were but parts of a united whole looking to the accomplishment of one general object. In *Tulloch v. Seattle,* 69 Wash. 178, 124 Pac. 481, there was drawn in question the submission to the electors of a bond issue to provide for the purchase of an existing street railway, or, in the alternative, for the construction of parallel lines thereto, in the discretion of the municipal officers. This was held to be but a single proposition looking to one end, to wit, the acquisition of one street railway system.

In *Aylmore v. Hamilton,* 74 Wash. 433, 133 Pac. 1027, there was drawn in question the submission to the voters of a bond issue for the construction of va-

rious highways and bridges in the county as a single proposition. Manifestly, in the light of the facts therein disclosed, this was not the uniting of unrelated projects; it was but a project of general improvement of the highways of the county, each and all parts of which had a measurable relation to each and all other parts.

In *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331, there was drawn in question the enlargement of a water power electric plant and the construction of an auxiliary steam plant to generate electric energy, all to further aid in the furnishing of electric light and power to the city of Seattle and its people. Here again it was manifestly correctly held that this was but the enlargement of one unit and the construction of another unit to one common end. It is true in that case it appeared that the steam plant, by reason of its proposed size and extent, made large, but not unnecessarily so, for meeting emergencies, would incidentally dispose of some of its surplus steam power upon occasions, but that being a mere minor incident to the main purpose, it did not call for a holding that its construction and maintenance were unrelated in its dominant principal purpose, the furnishing of electric light and power to the city of Seattle and its people.

In *Langdon v. Walla Walla,* 112 Wash. 446, 193 Pac. 1, there was drawn in question the construction of two units incident to the extension of the city's waterworks, where we held that the separate construction of such units were not unrelated projects, but merely parts of a single project and purpose on the part of the city, to wit, the extension of its waterworks. None of these decisions, we think, support the contention of counsel for the city that this proposed extension of the waterworks and the acquisition of a power plant

constitute one project capable of being lawfully submitted for ratification or rejection to the electors of the city as a single proposition.

Manifestly, the business, and it may well be called such in view of the proprietary capacity in which the city acts with reference thereto, of furnishing water to itself and its inhabitants, and the business of the city furnishing electric light and electric power to itself and its inhabitants, are different businesses. Each looks to the rendering of a different unrelated service by the exercise of a different unrelated grant of power. The mere fact that the construction and operation of two such plants might be efficiently economized by constructing and operating them so that both might in some measure be aided from one source, does not change the situation in so far as we are concerned with the right of the elector to vote separately on the questions of whether or not the city shall extend its waterworks and acquire a power plant. The decisions of the courts do not seem to be in harmony upon the question of what are related projects capable of being lawfully submitted to the electors as a single proposition. We are convinced, however, that we are committed to the view that the uniting of projects such as we have here under consideration and the submission of them to the electors for ratification or rejection as a single proposition is unlawful. The decisions in *Ostrander v. City of Salmon,* 20 Idaho 153, 117 Pac. 693, *Lanigan v. Town of Gallup,* 17 N. M. 627, 131 Pac. 999, and *Stern v. City of Fargo,* 18 N. D. 289, 122 N. W. 403, 26 L. R. A. (N. S.) 665, lend strong support to the conclusion we here reach. A note in L. R. A. appended to the decision in the last cited case is illuminating upon this subject. In view of our conclusion upon the question here considered, we find it

unnecessary to notice other contentions made in behalf of respondent against the validity of the ordinance and the election.

The judgment of the trial court is affirmed.

MAIN, C. J., HOLCOMB, and MACKINTOSH, JJ., concur.
TOLMAN, J., concurs in the result.