[No. 27789. *En Banc.* December 27, 1939.]

JOHN A. BAYHA, *Respondent,* v. PUBLIC UTILITY DIS-
TRICT NO. 1 OF GRAYS HARBOR COUNTY *et al.,*
*Relators,* THE CITY OF ABERDEEN,
*Intervener.*[1]

[1]Reported in 97 P. (2d) 614.

86

88

*E. E. Boner, F. A. LeSourd,* and *Preston, Thorgrimson & Turner,* for relators.

*Karl R. Bendetson (J. E. Stewart* and *E. L. Skeel,* of counsel), for respondent.

*Lester T. Parker,* for intervener.

*Houghton, Cluck & Coughlin, Emil P. Schubat, E. K. Murray, Herman E. Lafky, Brown & Millhouse, Neal, Brodie & Trullinger, Bruce E. McGregor, Barber & Canfield, Underwood & Campbell, Henderson & McBee, D. Elwood Caples, Charles R. Denney, Clyde W. Linville, Jr., Edgar H. Canfield, Ralph S. Barber,* and *George F. Yantis, amici curiae.*

JEFFERS, J.—This is an action instituted June 19, 1939, by John A. Bayha, on behalf of himself and all other taxpayers of the city of Aberdeen similarly situated,

against public utility district No. 1 of Grays Harbor county, a municipal corporation, and C. B. Sherwood, H. E. Bailey and Oliver Morris, as commissioners of such district, defendants, whereby plaintiff sought to enjoin and restrain the defendants from purchasing or entering into any contract or commitment for the purchase of any of the electric utilities of the Grays Harbor Railway & Light Company without first submitting the question of such purchase to the voters of the district for their approval. Injunctive relief was also sought by plaintiff relative to a contract entered into between the district and one Guy C. Meyers; to the inclusion in the district of the city of Aberdeen, for the purpose of supplying the inhabitants thereof with electricity; and to the rate of interest which the district had agreed to pay on bonds to be issued to finance the purchase of such utilities.

On June 22, 1939, a temporary restraining order and order to show cause were issued, returnable June 26th. The city of Aberdeen was permitted to intervene in the action, the city contending that it had spent over $125,000 on its own electric utility project and is at present making expenditures upon such project; that to allow the utility district to operate in the city of Aberdeen would be to permit and authorize two municipal corporations to exercise the same powers within the same district at the same time; and that the statute does not permit such competition.

Defendants filed a return to the show cause order, a motion to quash the temporary restraining order, and demurrers to the plaintiff's complaint and the complaint of intervener. Defendants also filed an answer to both the complaint of plaintiff and intervener. While it does not appear what action was taken by the court on the motion to quash or the demurrers, the trial court continued the restraining order in force up to and

during the trial, and then granted a permanent injunction. Defendants did not stand on their demurrers, but proceeded to trial, and no error is claimed herein based upon the failure of the court to sustain such demurrers.

The entire matter came on for hearing on July 10th, before Honorable Charles W. Hall, and all parties being present, the case was heard on the merits.

On September 8, 1939, the trial court entered its decree, wherein it permanently enjoined defendants from executing the contract in question for the purchase of the Grays Harbor Railway & Light Company's properties, for the reason that defendants had failed to adopt a plan and system resolution, as provided by Laws of 1931, chapter 1, p. 22, § 7, Rem. Rev. Stat., § 11611 [P. C. § 4498-17], and for the further reason that the question of such purchase had not been submitted to and approved by the voters of the district. The trial court decided in favor of defendants the other questions raised by plaintiff and intervener, holding that defendant district may exercise its statutory powers within the limits of the city of Aberdeen; that the contract between defendants and Guy C. Meyers, employing Meyers as fiscal agent of the district, is a valid and binding contract and not contrary to public policy; that the utility bonds proposed to be issued and sold by defendants, taken together with the Meyers contract, do not constitute a proposed issuance and sale below par and above the rate permitted by law; that neither the proposed purchase price to be paid for the utility properties nor the interest rate on the proposed bonds, when considered separately or when considered in relation to the Meyers contract, are constructively fraudulent.

Defendants have appealed from that part of the judgment adverse to them; plaintiff has cross-appealed

from that part of the judgment adverse to him; and intervener has cross-appealed from that part of the judgment which holds that defendant district may exercise its statutory powers within the limits of the city of Aberdeen.

Defendants will hereinafter be referred to as relators, plaintiff and cross-appellant as respondent, and intervener and cross-appellant as intervener. The Grays Harbor Railway & Light Company will be referred to as the Grays Harbor Company.

■ On October 3, 1939, relators filed in this court their application for a writ of certiorari to review the decision of the trial court, and the matter is now before us on this application.

All of the records in the case are before us, and neither respondent nor intervener is making any particular objection to granting the writ, provided this court is of the opinion that it is a proper case for a review of the entire record.

In support of their application for the writ, relators show by way of affidavit, and it is not disputed, that the contract which the trial court enjoined relators from entering into will expire January 2, 1940, unless by that time relators can proceed to carry out the terms thereof; that an appeal cannot be perfected and heard in time to have the validity of this contract determined by this court before the expiration of the contract; and that relators will therefore have lost any benefit to be derived from such contract, even though they should prevail in their appeal.

Rem. Rev. Stat., § 1002 [P. C. § 7418], states the grounds for granting a writ of certiorari, and among others, it is stated the writ shall be granted when, in the judgment of the court, there is no plain and adequate remedy at law. In the early case of *State ex rel. Smith v. Superior Court*, 26 Wash. 278, 66 Pac. 385,

we find the following rule announced, which we believe has been consistently followed by this court:

"This court has held in a long line of recent cases that the extraordinary writs of certiorari, prohibition, and mandamus will not issue to correct the action of the superior court when the court is acting erroneously, either with or without jurisdiction, but always with the provision that there is an adequate remedy by appeal. This adequate remedy has not been construed to be as speedy a remedy as the remedy by extraordinary writ might be, but a remedy which preserves the fruits of the appeal when won. In other words, the *status quo* of the parties litigant must be preserved, and, if by awaiting the result of an appeal the fruits of the litigation would be lost, the remedy has not been considered an adequate remedy."

See, also, *State ex rel. Meredith v. Tallman*, 24 Wash. 426, 64 Pac. 759; *State ex rel. Kent v. Superior Court*, 109 Wash. 336, 186 Pac. 851; *State ex rel. Silver Basin Mining Co. v. Superior Court*, 110 Wash. 559, 188 Pac. 384; *State ex rel. Bayless v. Superior Court*, 116 Wash. 535, 199 Pac. 977; *State ex rel. Daigneault v. Superior Court*, 124 Wash. 90, 213 Pac. 677; *State ex rel. Turner v. Paul*, 182 Wash. 261, 46 P. (2d) 1060.

We think the writ should issue.

We shall now proceed to a consideration of the case on the merits.

While a more detailed statement of the testimony will be made in connection with the different questions raised, we desire at this point to make a general statement of the facts, which we believe to be substantiated by the testimony.

Public utility district No. 1 of Grays Harbor county was created by an election held in the fall of 1938, with boundaries co-extensive with the boundaries of the county. At this election, the relator commissioners were elected, and they, soon after their election, be-

gan to investigate the possibilities of acquiring electrical properties for the purpose of bringing about public ownership and distribution of electricity throughout the district.

Apparently realizing the necessity of having a man familiar with financing projects of this character, and who was in contact with banking interests capable of furnishing such finances, the commissioners, acting upon the advice of J. D. Ross, entered into a contract with one Guy C. Meyers. This contract, among other things, provided that Meyers was to find a purchaser for the bonds to be issued and was to act as financial agent of the district. The commissioners also procured the permission of Mr. Ross, who was then in charge of the Bonneville project, to allow a Mr. Beck to investigate and appraise the properties of the Grays Harbor Company. Mr. Beck, with his crew, made this investigation and appraisal, without cost to the district. This work by Mr. Beck and his crew continued up until about the middle of April, 1939. Mr. Meyers succeeded in getting together a syndicate which agreed to take the bonds.

This investigation finally culminated in a contract being entered into between the district and the Grays Harbor Company, wherein the district agreed to purchase the properties of the company for the sum of $2,842,000, which was the figure fixed by Mr. Beck as the fair value.

The first question to be considered under relators' assignments of error is whether or not Rem. Rev. Stat., § 11610 [P. C. § 4498-16], requires an election as a prerequisite to the purchase by a public utility district of the properties of a utility privately owned, where the purchase is to be financed by utility revenue bonds. This question particularly involves the construction of the proviso found in subd. (b), of

§ 11610, *supra.* The entire act, of which § 11610 is a part, consists of Rem. Rev. Stat., §§ 11605 to 11616 [P. C. §§ 4498-11 to 4498-22], both inclusive. We think it may be helpful in this matter to have in mind the purpose of this act, and we desire therefore to call attention to § 11605 [P. C. § 4498-11], which provides:

"Purpose of act. The purpose of this act is to authorize the establishment of public utility districts to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses."

Section 11610 provides:

"Powers of districts—Manager—Duties—Procedure —Boundaries—Sale of plants. All public utility districts organized under the provisions of this act shall have power:

" (a) To make a survey of hydro-electric power, irrigation and domestic water supply resources within or without the district, and to compile comprehensive maps and plans showing the territory that can be most economically served by the various resources and utilities, the natural order in which they should be developed, and how they may be joined and co-ordinated to make a complete and systematic whole;

" (b) To construct, condemn and purchase, purchase, acquire, lease, add to, maintain, operate, develop and regulate all lands, property, property rights, water, water rights, dams, ditches, flumes, aqueducts, pipes and pipe lines, water power, leases, easements, rights of way, franchises, plants, plant facilities and systems for generating electric energy by water power, steam or other methods, plant, plant facilities and systems for developing, conserving and distributing water for domestic use and irrigation, buildings, structures, poles and pole lines, and cables and conduits and any and all other facilities, and to exercise the right of eminent domain to effectuate the foregoing purposes or for the acquisition and damaging of the same or property of any kind appurtenant thereto, and for the purpose of

acquiring the right to make physical connection with plants and plant facilities of any and all persons, corporations and municipalities, and such right of eminent domain shall be exercised and instituted pursuant to resolution of the commission. . . . It shall be no defense to a condemnation proceeding hereunder that a portion of the electric current generated or sold by such public utility district will be applied to private purposes provided the principal uses intended are public; *Provided, That no public utility owned by a city or town shall be condemned hereunder, and none shall be purchased without submission of the question to the voters of the utility district.* . . . " (Italics ours.)

Calling attention now to the proviso found in subd. (b), § 11610, *supra,* we think it must be admitted that the second part of the proviso, beginning "none shall be purchased," means absolutely nothing when standing alone. The subject of the phrase is "none," and it must have an antecedent to give the phrase meaning. To what, then, does "none" refer? What is its antecedent?

Webster's New International Dictionary (2d ed.) 1935, defines "none" as a pronoun meaning "no one;" "not any;" "nobody." Nesfield, in Outline of English Grammar (1927), classifies the word "none" as a demonstrative pronoun, and states: "A demonstrative pronoun points to some noun going before, and is used instead of it. . . ."

Relators contend that "none" refers back to "public utility owned by a city or town;" respondent contends that it refers to any public utility, however owned, and is a limitation on the general grant of power to purchase, etc.

The first part of subd. (b), of § 11610, contains a general grant of power to the district to construct, condemn and purchase, purchase, acquire, etc. We think subd. (b) is concerned primarily with the power

granted to a district. No limitation on the power to purchase is found in this section until we come to the proviso; in fact, there is no provision anywhere in the act, other than in the proviso, which limits the power of the commissioners to purchase, condemn, etc., by requiring that such action first be submitted to the voters of the district, and their approval obtained, except in § 11611, which provides that where a *general indebtedness is to be incurred, which will bring the indebtedness of the district to an amount exceeding one and one-half per cent of its taxable property,* the proposition of incurring such indebtedness and the proposed plan shall be submitted to the electors. In no place in § 11610, prior to the proviso, is the term "public utility" used, except as used in the name "public utility district." Is it not logical, then, to say that, inasmuch as the only place the words "public utility" are used in the section is in the first part of the proviso, and as used, these words are qualified by the following words "owned by a city or town," the word "none" must refer to "public utility," as therein qualified, or, in other words, to a public utility owned by a city or town?

In 59 C. J. 1090, § 640, the rule relative to a proviso is stated as follows:

"The operation of a proviso is usually and properly confined to the clause or distinct portion of the enactment which immediately precedes it, and does not extend to or qualify other sections, unless the legislative intent that it shall so operate is clearly disclosed."

See *State v. Robinson,* 67 Wash. 425, 121 Pac. 848; also *State v. Fabbri,* 98 Wash. 207, 167 Pac. 133; 2 Lewis' Sutherland Statutory Construction (2d ed.), 673, § 352.

In *Towson v. Denson,* 74 Ark. 302, 86 S. W. 661, the rule is thus announced:

" 'When the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms.' "

In *United States v. Bernays,* 158 Fed. 792, we find the following statement:

"A proviso should be construed with reference to the subject-matter of the sentence of which it forms a part unless it clearly appears to be designed by the Legislature for a broader or more independent operation."

See, also, 2 Lewis' Sutherland Statutory Construction (2d ed.), 811, § 420; *State ex rel. Peck v. Anderson,* 92 Mont. 298, 13 P. (2d) 231; *Hopkins v. Anderson,* 218 Cal. 62, 21 P. (2d) 560.

It is contended by respondent that it would be a meaningless thing to require the question of the purchase of a municipally owned public utility to be submitted to the voters and not to require the purchase of a privately owned utility to be so submitted, as the law now requires that a municipality must submit to the voters the question of a sale of its utilities before such sale can be made. It is further contended that, unless the purchase of a privately owned utility must be submitted to the voters, no safeguard will be thrown around the acts of the commissioners.

We think a sufficient answer to respondent's contention is found in a study of the entire act, and that, from such examination, the conclusion is inescapable that the legislature did not intend to limit the power of the commissioners of a public utility district in the purchase, etc., of utilities, as provided in the act, except as to those public utilities owned by a city or town or where a general indebtedness is to be incurred which will run the general indebtedness of the district above

the one and one-half per cent limit. It might also be said that, even though the law requires a municipality to secure the approval of the voters before it can sell a public utility, the act in question requires the entire district to approve a purchase of a public utility owned by a city or town.

The legislature has seen fit to vest the commissioners of a public utility district with almost unlimited powers relative to the construction, purchase, etc., of utilities, and in the sale of utility revenue bonds to finance such operations. This the legislature had a right to do, and we cannot therefore limit the powers granted unless such limitation is plain, nor can we otherwise interfere with the exercise of the powers granted unless such powers are exercised capriciously and arbitrarily, or fraudulently.

Rem. Rev. Stat., §§ 5422 to 5425 [P. C. §§ 2775 to 2778], provide for arguments for and against a proposed initiative measure, and the distribution of pamphlets containing such arguments to the voters prior to the election. Relators introduced herein exhibit No. 14, which is a pamphlet containing arguments against the public utility act, and in such argument it was contended that the act gave the commission almost unlimited power to purchase, etc., the property of utility companies. We think it must be assumed, then, that the people, in voting on this initiative, did so believing that public utility districts had the broad powers claimed in such argument. We held in *Denny v. Wooster*, 175 Wash. 272, 27 P. (2d) 328, that arguments made in pamphlets for and against an initiative measure might be considered by the court in determining the purpose and intent of the act. We do not think the cases of *Spokane v. State*, 198 Wash. 682, 89 P. (2d) 826, and *United States v. Trans-Missouri*

*Freight Ass'n,* 166 U. S. 290, 41 L. Ed. 1007, 17 S. Ct. 540, cited by respondent, hold to the contrary.

Considering, then, the intent as indicated by an examination of the entire act, the ordinary meaning of the words used in the proviso, the generally accepted rules of grammatical construction, the location of the proviso in the section relative to the general grant of power, and other factors appearing herein, we are of the opinion the word "none," as used in the proviso, refers to "public utility owned by a city or town;" and this being true, the proviso is not a general limitation on the powers of the commissioners to purchase, but is only a limitation on the powers of the commissioners to purchase a public utility owned by a city or town, and does not therefore require an election as a prerequisite to the purchase by the district of a privately owned utility, where the purchase is to be financed by utility revenue bonds.

It is next contended by relators that the court erred in holding that relators had failed to provide for a plan or system, as provided in Rem. Rev. Stat., § 11611. This section provides:

"Whenever the commission shall deem it advisable that the public utility district purchase, purchase and condemn, acquire, or construct any such public utility, or make any additions or betterments thereto, or extensions thereof, the commission shall provide therefor by resolution, which shall specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, and specify whether general or utility indebtedness is to be incurred, the amount of such indebtedness, the amount of interest and the time in which all general bonds (if any) shall be paid, not to exceed thirty years. In the event the proposed general indebtedness to be incurred will bring the indebtedness of the public utility district to an amount exceeding one and one-half per cent (1½%) of the taxable property of the public utility

district, the proposition of incurring such indebtedness and the proposed plan or system shall be submitted to the qualified electors of said public utility district . . .

"Whenever the commission (or a majority of the qualified voters of such public utility district, voting at said election, when it is necessary to submit the same to said voters) shall have adopted a system or plan for any such public utility, as aforesaid, and shall have authorized indebtedness therefor . . . , general or public utility bonds may be used as hereinafter provided. . . . "

It will be noticed that, unless a general obligation of the district is to be created which will bring the general indebtedness of the district to more than the one and one-half per cent debt limit, no particular time is specified when the plan or system resolution shall be passed, other than that it shall be passed "whenever the commission shall deem it advisable that the public utility district purchase, etc." It is evident that the legislature did not deem it necessary that any publicity be given to such plan or system resolution, as no provision is made for publishing same or for any public hearing thereon, so the argument made by respondent, that the public are entitled to be advised of the plans of the commission, would not seem to be of much weight.

We think a reasonable interpretation of this provision relative to the plan or system resolution would require that the commissioners pass a plan or system resolution when they are possessed of the facts upon which to base a plan or system and have determined on any such plan, but before the actual consummation of the purchase of any utility pursuant to such plan, and before general or public utility bonds are issued. We do not think, however, the provision of

the statute relative to the time of passing the plan or system resolution is mandatory.

In the instant case, it was not necessary to submit to the voters either the proposed plan or the question of the purchase.

On June 20, 1939, the commission passed a plan or system resolution, therein specifying, among other things, that it was the plan to purchase the properties of the Grays Harbor Company, and that the estimated cost of the plan or system was $3,350,000; that to defray the cost of the system, utility revenue bonds would be issued, bearing interest at the rate of four and one-quarter per cent per annum. The resolution in other respects, in so far as its contents are concerned, complied with the statute.

It is apparent from the testimony herein that the commission was making an investigation of the possibilities of bringing electricity to residents of the district, and particularly was investigating the properties of the Grays Harbor Company, and we think it is true that, in the latter part of April, the commission had pretty definitely determined upon the plan of purchasing such properties. However, there were some things which remained to be settled, and while we are of the opinion the statute does not contemplate that the plan or system must be exact in every detail, we are impressed with the fact that these commissioners were attempting to work out all the details before definitely committing themselves to such plan.

Considerable is said about the secrecy with which the commission conducted the negotiations herein. While the commission might have followed a different policy in regard to the publicity to be given its actions relative to the purchase of the properties herein mentioned, yet, there being no provision requiring any such publicity, we do not feel that it is the function

of this court to substitute its judgment for that of the commissioners and say that the policy pursued by the commission was not for the best interests of the district.

While the contract involved herein was signed by the commissioners on June 15th, it does not appear that it was signed by the officer of the Grays Harbor Company in New York until June 23d. It appears from the testimony that a form of contract had been sent to the commission to be executed, but that the attorney for the commission recommended that some changes be made in the contract. Such changes were made, and the contract was then signed and delivered to Mr. Meyers, to take to New York. A change having been made in the contract as prepared, it was not known whether the Grays Harbor Company would sign or not, and the commissioners were not advised until June 23d that it had been signed by the company and had become a binding contract.

We are of the opinion there has been a substantial compliance with the statute herein, and that the failure of the commissioners to pass a plan or system resolution prior to the signing of the proposed contract was, at most, only an irregularity which would not affect the validity of the contract.

Respondent cites the cases of *State ex rel. Matson v. Superior Court,* 42 Wash. 491, 85 Pac. 264, and *Dunkin v. Blust,* 83 Neb. 80, 119 N. W. 8. We do not think these cases are in point as sustaining respondent's contention. In the *Matson* case, the court held that a petition to establish a drainage district was insufficient, because of a failure to set out therein certain statutory requirements relative to a proposed system. The *Blust* case decided that, where an appropriation ordinance was passed prior to a publication thereof in a newspaper for four weeks, as provided by statute, a tax-

payer was entitled to a restraining order enjoining the trustees from proceeding under the ordinance. This case does not pass upon the question of whether or not the failure to publish the estimate would invalidate contracts made or obligations entered into involving the expenditure of the funds so appropriated.

We now come to the cross-appeals of respondent and intervener.

■ Respondent and intervener contend the trial court erred in refusing to restrain the relator district from entering into the light and power business in the city of Aberdeen. This contention is based on the proposition that the city has sufficiently begun construction of a hydro-electric plant of its own, so that it should be held to have a prior right to furnish electricity to its inhabitants.

The section of the statute under which the trial court held the relator district had the right to exercise its statutory powers within the city of Aberdeen, is Rem. Rev. Stat., § 11616 [P. C. § 4498-22], which provides in part:

"No public utility district created hereunder shall include therein any municipal corporation, or any part thereof, where such muncipal corporation already *owns* or *operates* all the utilities herein authorized; Provided, that in case it does not *own* or *operate* all such utilities it may be included within such public utility district for the purpose of establishing or operating therein such utilities as it does not *own* or *operate.*" (Italics ours.)

Both respondent and intervener argue that, under this statute and under a general well established rule of law, two municipal corporations, having concurrent jurisdiction and having in part the same granted powers, cannot exercise such identical powers, at the same time, in the same territory. Many authorities are cited to support such contention, and we have no

fault to find with such authorities; but we are of the opinion that they are not applicable to the facts herein, for the reason that the trial court held the city of Aberdeen did not *own* or *operate* any electric utility for the service of its people, and it would seem to follow that, unless the court was in error in so holding, the question of two municipal corporations covering the same territory and exercising the same powers in the same territory, was not before the court. The statute in question seems to be plain, and authorizes a public utility district to include therein any municipal corporation, for the purpose of establishing or operating therein such utilities as such municipal corporation does not *own* or *operate*.

It is evident, then, from the statute, that the question which must first be determined is whether or not intervener owns or operates a utility for the purpose of furnishing electricity to the people of such city.

Several ordinances were passed by the city of Aberdeen for the purpose of increasing its water supply, and for the construction of a hydro-electric plant on the Wynooche river to furnish electricity to the city. The first ordinance was passed in 1923, being ordinance No. 2307, and provided for both an additional water supply and the construction of a hydro-electric plant. The plan set out in this ordinance was approved by the voters, but this court, in the case of *Dole v. Aberdeen,* 131 Wash. 516, 230 Pac. 401, restrained the issuance of bonds to finance such project.

Thereafter, ordinance No. 2833 was passed, to provide for the construction of a hydro-electric plant on the Wynooche river, and this ordinance was approved by the voters June 29, 1926. On May 3, 1927, the people of the city of Aberdeen approved a plan for making betterments and extensions to the municipal water system, as provided in ordinance No. 3018, at an esti-

mated cost of $1,600,000, to be financed by a bond issue.

A resolution was passed June 23, 1939, by intervener, instructing the city attorney to commence an action against relators, to determine whether the city of Aberdeen could be included within the district. The resolution further provided that, if it was determined that the city could not be so included, it was the intention of the city to continue with the construction of the hydro-electric plant, as provided in ordinance No. 2833.

S. E. Watkins, city engineer and water superintendent of intervener, who had been in the employ of the city since 1920, and who was the engineer in charge of the preliminary work on the Wynooche hydroelectric project, testified that preliminary surveys investigating the feasibility of the project were conducted from 1923 to 1925, at which latter date definite surveys were started; that the last survey was made in 1927; that reports were made to the city council, the last report being in 1927; that topographical and geological surveys were made in 1925, 1926, and 1927; that test pits were dug in 1925, 1926, 1927, and 1928; that tunnels and shafts were dug, diamond explorations were made, a temporary camp constructed, a road put in to the camp, and a gauging station set up to measure the flowage of the river; in short, that practically all the work which was ever done on the project was done between 1924 and 1928, with the exception that two men have been stationed at the camp for about six months each year to attend the river and rainfall gauges.

There is no concrete in place, nor does the city own any land at the proposed damsite. Intervener's exhibit No. 16 is a statement taken from the books of the city, showing expenditure by years for various items in connection with the project. All the items total

$125,796.62, and were paid from the water fund of the city. Very little has been spent on this project since 1929, and no plans have been made sufficient to commence construction.

Mr. Bailey, one of relators, who had been mayor of the city of Aberdeen for eight years and had served on the council for six years, testified that he was the first official to propose to the council the development of the hydro-electric project, and that "there was really nothing done after the election" to carry out the provisions of ordinance No. 2833; that no bonds were ever sold, and that the city does not own or operate any generating or distributing system.

Pursuant to a local improvement district plan, a lamp post system, or street lighting system, was erected, owned by the city, and apparently paid for by the property owners. This consists simply of ornamental iron lamp posts set in the sidewalks, and the purpose was for street lighting. The energy for this system was all purchased from the Grays Harbor Company, which, at the present time, furnishes all the electrical energy used in the city.

It also appears that intervener had at one time made application to the Federal power commission for permission to flood government lands. By letter of April 20, 1928, the commissioners closed out this application, without prejudice. No attempt has been made to reopen this application.

The city was granted a permit by the state to appropriate the water of Wynooche river. Three extensions of time for the beginning of construction have been granted. The last extension was granted in 1935 and extended to October 15, 1940, the time for the beginning of construction.

It appears from this testimony that intervener neither owns nor operates a utility for the purpose of

furnishing electricity to the inhabitants of the city. It follows, then, it seems to us, that the questions raised by respondent and intervener relative to the dual operation of utilities by two municipal corporations, having the same granted power, in the same territory, was not before the trial court and is not before this court.

We are in accord with the ruling of the trial court that intervener neither owns nor operates a utility for the purpose of furnishing electricity to its inhabitants, and that the relator district is therefore authorized by § 11616, *supra,* to exercise the power therein granted, in so far as such right pertains to the establishing and operating of a utility within the limits of the city, for the purpose of furnishing electricity to the inhabitants thereof.

We express no opinion on the other questions raised by respondent and intervener relative to the rights of relator district or the rights of intervener to establish and operate a utility within the limits of the city of Aberdeen for the purpose of supplying its inhabitants with electricity.

 It is next contended by respondent on his cross-appeal that the purchase price of $2,842,000 is so excessive as to be constructively fraudulent. This contention is based principally on the difference in valuation placed on the properties of the Grays Harbor Company by Robert W. Beck and James W. Carey. The former placed the market value at $2,842,000, and the latter at $2,321,528. The trial court held that the purchase price of $2,842,000, being the value fixed by Mr. Beck, was not so excessive as to be constructively fraudulent.

There are many pages of testimony relative to the qualifications of these two men and concerning the details of the methods used by them in arriving at the

values reached. We think no good purpose would be served by attempting to go into these details. Suffice it to say that, from the testimony, it appears that both of these men were well qualified, by training and experience in dealing with electrical properties, to make the appraisement and fix a value. However, we think the trial court was justified in holding the value placed by Mr. Beck as not excessive.

It appears that Mr. Beck was chief electrical engineer on the Bonneville project and was assigned by J. D. Ross, in charge of such project, to make this appraisement; and that Mr. Beck and a crew of men made a careful inspection, on the ground, of all the properties, and made a study of all the problems pertaining to these properties and the problems confronting the district in taking over the properties. This study, among many other things, included revenues, betterments, extensions, reproduction new less depreciated value, and many other features, from which he finally fixed his value. This work consumed several months.

We desire not to be understood as being critical of the ability or qualifications of Mr. Carey, but we think the doubt which is cast upon the accuracy of his valuation is because of the time element, which he frankly admits all through his testimony compelled him to use methods which he did not consider as accurate as an investigation on the ground.

Mr. Carey made no investigation of the properties on the ground, but started with a valuation fixed by him for rate-making purposes when he was chief engineer for the department of public works, in 1933 and 1934. The report made by Mr. Carey at that time contained an inventory of the Grays Harbor Company properties as of June 30, 1933, reproduction cost as of March 5, 1934. The value fixed at that time by him

was $2,130,038. He made the valuation used herein in June or July, 1939, for the purpose of use at this trial. Mr. Carey arrived at his valuation herein by taking as a base the figures he had used in his 1934 report, and by the use of price level indices for the year 1938, which he obtained from the Engineering News Record; the various figures used in his 1934 report were brought up to date, that is, priced according to the average 1938 level, as shown by these indices.

Mr. Carey several times stated that the best way to value property was to go into the field and appraise it, and that the use of the average price level for 1938 was not as accurate as taking prices as of the present time. He further admitted that conscientious engineers might differ as much as twenty-five or thirty per cent in estimating reproduction new. Mr. Carey admitted that the method used by him was not the best method, but that, from the available information, and without making a new appraisement, he had adopted a method which should result in a figure *somewhere around the figure which should be arrived at from the actual appraisal.* The trial court, in its memorandum opinion, had this to say of the Carey method:

"I am of the opinion that the general method underlying Mr. Carey's testimony is not the proper method to be adopted in reaching a purchase and sale price of the plant of the Grays Harbor Railway & Light Company."

Rem. Rev. Stat., § 11608 [P. C. § 4498-14], provides that "the powers of the public utility district shall be exercised through a commission consisting of three members . . ." We have heretofore stated that, under the statute, the commission is given broad powers relative to the purchase of utilities, and that we cannot interfere with the granted powers unless it is clearly shown that such powers are used arbi-

trarily and capriciously, or fraudulently exercised. This general rule is announced in *Ponischil v. Hoquiam Sash & Door Co.,* 41 Wash. 303, 83 Pac. 316.

A case also much in point is *Columbia River Timber etc. Co. v. Commissioners,* 108 Wash. 148, 183 Pac. 134. The last cited case has a marked similarity to the instant case, in that, in the cited case, an engineer testified that the contemplated improvement could be made for $108,000. The commissioners were going to make the improvement at a cost of $168,000, upon the recommendation of the engineer they had employed. This court held that, since the evidence did not show fraud or arbitrary or capricious action, the case involved nothing but a question of difference of opinion concerning matters which the commissioners were, by virtue of their position, called upon to decide, as administrative officers. See, also, *In re Drainage Dist. No. 10,* 119 Wash. 8, 204 Pac. 1050; *Clise v. Seattle,* 153 Wash. 661, 280 Pac. 80; *Blade v. La Conner,* 167 Wash. 403, 9 P. (2d) 381.

We think the trial court properly held that, under the testimony, it was not shown the purchase price to be paid for the Grays Harbor Company properties was so excessive as to be constructively fraudulent.

■ It is also contended by respondent that the court erred in holding that the contract entered into between the district and Guy C. Meyers was not contrary to public policy and that its execution was not an abuse of discretion on the part of relators, and in refusing to restrain relators from performing such contract.

Mr. Meyers was employed by the relators at their first regular meeting on December 7, 1938, and his contract was signed at that time. However, prior to December 7th, there had been informal meetings of the commissioners. They had discussed methods of procedure with the commissioners of other districts

and with J. D. Ross, then in charge of the Bonneville project, and were advised by Mr. Ross that it would be necessary for them to have an agent who was familiar with the proposition of financing projects of this character, and who was in contact with banking institutions capable of financing such a project. It is apparent that the commissioners realized, to some extent at least, the difficulties confronting them in the sale of bonds to finance this project.

Each of the relator commissioners testified that Mr. Meyers had nothing to do with determining the purchase price to be paid for the Grays Harbor Company properties, and that he merely acted as an intermediary between the commissioners and the owners of the Grays Harbor Company in New York.

Rem. Rev. Stat., § 11610, *supra,* in subd. (j), provides that the district shall have power

"To make contracts, employ engineers, attorneys and other technical or professional assistance; to print and publish information or literature and to do all other things necessary to carry out the provisions of this act."

It should also be kept in mind that § 11611 provides that "said bonds shall be sold in such manner as the commission shall deem for the best interest of the district."

There is no fixed procedure outlined by the statute for the commissioners of a district to follow in the acquisition of a utility. The method to be used is left to the discretion of the board, and this is also true in regard to the sale of its bonds or warrants. We think what we have heretofore said regarding the exercise of this discretion applies to the Meyers contract. We are of the opinion that § 11610, *supra,* expressly authorizes the commissioners to employ such assistance as

they deem necessary to assist them in the acquisition of a utility and in the sale of bonds or warrants.

A case which seems much in point as sustaining the rights of the commissioners to make the Meyers contract is *Consolidated School Dist. No. 20 ex rel. Thompson v. Union Trust Co.*, 124 Wash. 501, 215 Pac. 28; as is also the case of *Kennedy v. McInturff*, 217 Cal. 509, 20 P. (2d) 315.

It is urged by respondent that the Meyers contract was an abuse of discretion, because the district agreed to pay Meyers two and one-half per cent of the purchase price of this utility, and to give him an option to purchase the bonds or warrants. When we consider all the things Meyers was to do under this contract, which included the negotiations relative to the purchase of the property, the procuring of a purchaser for the bonds, which it was contemplated would necessitate the forming of a syndicate, and the fact that he was to pay all this expense out of his commission, we do not think there was any abuse of discretion on the part of the commissioners.

It might be added that it was shown by testimony that it was necessary that Meyers have this option in order that he be in a position to guarantee to prospective purchasers of the bonds that he could deliver the bonds. It was not shown that this option was used for the personal advantage of Meyers, or that he was in any way interested in the syndicate formed to purchase the bonds, or that he had agreed to purchase any of the bonds, or that he was to receive anything from the syndicate for his services, or that he will receive anything for his services other than the commission, as provided in his contract.

We are also of the opinion that the validity of the Meyers contract cannot be determined in this action. Certainly, the rights of Meyers cannot be deter-

mined, he not being a party to the action. We find this general rule stated in 1 Freeman on Judgments 683, § 339:

"But it is equally fundamental that parties whose rights are to be affected must be before the court. Unless they are brought in by appropriate process or notice or voluntarily submit themselves to the jurisdiction of the court, it is powerless to bind them by any judicial determination."

To the same effect is 15 R. C. L. 844. Our own court has followed this general rule in *State ex rel. Reed v. Gormley*, 40 Wash. 601, 82 Pac. 929, 3 L. R. A. (N. S.) 256, where the rule is stated that:

"It is a rule of law, as old as the law itself, that a court cannot adjudicate the rights of parties who are not actually or constructively before it, with an opportunity to defend or maintain their rights in the action."

It is next contended that the bond issue constitutes a sale below par. The bonds are to be sold to John Nuveen & Company, Chicago, and Hartly, Rogers & Company, Seattle, who are to take the bonds at par value. The bonds bear four and one-quarter per cent interest. Under Rem. Rev. Stat., § 11610, subd. (f), the district is authorized

". . . to issue general obligation or utility bonds therefor, bearing interest at a rate not exceeding six per cent per annum, payable semi-annually, said bonds not to be sold for less than par and accrued interest. . . ."

Respondent's contention is based on the fact that Meyers, as fiscal agent, is in privity with the bidding syndicate; and that, when his two and one-half per cent commission is added to the first year's interest on the bonds, the interest rate will be greater than six per cent, and in violation of the statute. We think this contention cannot be sustained. We have already

stated that we are of the opinion it does not appear from the testimony that Meyers is in any way connected with the purchasers of the bonds, and it does not appear that he has agreed to purchase any of the bonds, or that the purchasers are to receive any part of the Meyers commission. Respondent's contention would find support if the commission, or any part of it, was to go to the purchasers of the bonds.

We have been cited to no authority in this state to the effect that a municipality may not pay a commission to an agent for his services in procuring purchasers for a bond issue, such agent being independent of the purchasers, where the statute permits the bonds to be sold in any manner which may be deemed for the best interests of the district, or that such a commission shall be considered in determining whether or not the bonds were sold below par. The general rule is that a commission may be paid to a *bona fide* agent, where such services are necessary and the value of the services are reasonably within the amount of the allowance. McQuillin on Municipal Corporations (2d ed.), Rev. Vol. 6, 217, § 2463. See note in 91 A. L. R., at page 16, for a discussion of Washington cases; also pages 51 and 56. See, also, 2 Dillon on Municipal Corporations (5th ed.), 1399; *Park v. Rural Special School Dist. No. 26*, 173 Ark. 892, 293 S. W. 1035; *Manitou v. First Nat. Bank*, 37 Colo. 344, 86 Pac. 75.

As we have said, the bonds are to be sold to John Nuveen & Company, Chicago, and Hartly, Rogers & Company, of Seattle. Mr. Prescott, vice-president of the Seattle company, testified that, while Meyers was responsible for interesting the companies in the bonds, all of his (Prescott's) dealings, so far as the purchase of the bonds was concerned, were with the commissioners of the district. Prescott further testified there never was any agreement between the banking syndi-

cate and Meyers, and that Meyers was in no way interested in the bonds, and the banking group was in no way interested in the Meyers contract.

We are therefore of the opinion that the payment of the commission to Meyers would not result in a sale of the bonds below par.

■ The last contention made by respondent on his cross-appeal is that the bonds in question could not be sold at private sale, and that the manner in which they were sold stifled competition. The district is authorized by Rem. Rev. Stat., § 11611, to sell bonds and warrants in such a manner as the commissioners shall deem for the best interest of the district.

Respondent first contends that Laws of 1933, Ex. Ses., chapter 30, p. 77, repealed the above proviso of the public utility statute, and requires that all bond issues, whether revenue or general obligation bonds, must be sold at public sale, unless specifically otherwise permitted. We think only a reading of chapter 30, *supra*, is necessary to show the fallacy of respondent's contention. Chapter 30, Laws of 1933, Ex. Ses., is Rem. Rev. Stat. (Sup.), § 5583-11 [P. C. § 5470-11] *et seq.*

Rem. Rev. Stat., § 5583-3 [P. C. § 5475-3] (Laws 1923, chapter 151, p. 488, § 3), provides that all bonds issued by any municipal corporation shall be sold at public auction, and a notice calling for bids shall be published, as prescribed by statute.

Rem. Rev. Stat., § 5583-6 [P. C. § 5475-6] (Laws 1923, chapter 151, p. 490, § 6), provides: "This act shall not apply to public utility bonds payable wholly from the earnings of such utility."

Rem. Rev. Stat. (Sup.), § 5583-11 *et seq.* (Laws of 1933, Ex. Ses., chapter 30), was enacted in 1933, and relates only to the sale of bonds to the United States government. We are of the opinion it was not the

intention of the legislature, by the enactment of Rem. Rev. Stat. (Sup.), § 5583-11 *et seq.,* to repeal the provisions of chapter 151, Laws of 1923, or to deprive a public utility district of the right to sell its bonds or warrants at private sale; but that the only purpose of § 5583-11 *et seq., supra,* was to broaden the powers of municipal corporations to sell their bonds to the United States government.

We do not think chapter 160, Laws of 1935, p. 511, Rem. Rev. Stat. (Sup.), § 9663B-1 [P. C. § 2534-81] *et seq.,* which is the flood control act, has any application to the questions raised herein, or in any way tends to show that the right to sell utility revenue bonds of a public utility district at private sale has been repealed.

■ Did the option clause in the Meyers contract tend to stifle competition? Respondent contends this option clause prevented competitive bidding by rival investment bankers or groups of investment bankers.

Had the statute required that the bonds of this district be sold at public sale, or had the commissioners decided to sell the bonds at public sale, it is possible that this option clause might have had some effect on prospective bidders, but that situation is not before us. The commissioners had the right to sell these bonds in any manner they should deem for the best interest of the district. After investigation, they decided it would be for the best interest of the district to organize a syndicate and sell the bonds at private sale. Our investigation of this record leads us to the conclusion that this plan was for the best interest of the district, and we are further of the opinion that the option clause did not tend to stifle competition, under the plan followed. Of course, it might be contended that any private sale tends to eliminate open competition,

and still the statutes, in many instances, provide that property may be sold at private sale.

For a general discussion of the authority of a municipality to sell bonds where no specific procedure is prescribed by statute, see *Washington-Oregon Corp. v. Chehalis*, 76 Wash. 442, 136 Pac. 681.

The bonds in question are to be sold at par, and it does not appear that the interest rate of four and one-quarter per cent is not a fair rate of interest.

Respondent cites *Owens v. Wright*, 161 N. C. 127, 76 S. E. 735, Ann. Cas. 1914D, 1021; *Virginia Bridge & Iron Co. v. Crafts*, 2 Ga. App. 126, 58 S. E. 322; *Finley Method Co. v. Standard Asphalt Co.*, 104 Fla. 126, 139 So. 795; *Terwilliger Land Co. v. Portland*, 62 Ore. 101, 123 Pac. 57; *Kuhn v. Buhl*, 251 Pa. 348, 96 Atl. 977, Ann. Cas. 1917D, 415; *White v. McMath & Johnston*, 127 Tenn. 713, 156 S. W. 470, 44 L. R. A. (N. S.) 1115. We do not think any of the cited authorities are in point.

From the entire record in this case, it appears that the commissioners acted in good faith; no abuse of discretion has been shown; a public sale of the bonds was not required by statute; and it follows that the trial court was right in holding that the sale should not be enjoined.

The judgment is reversed on relators' appeal, affirmed on the cross-appeal of respondent, and affirmed on the cross-appeal of intervener.

ALL CONCUR.