[No. 31558.   Department One.   March 10, 1951.]

PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY *et al., Appellants,* v. THE TOWN OF NEWPORT *et al.,* *Respondents.*[1]

[1]Reported in 228 P. (2d) 766.

*Clarence C. Dill* and *Trumbull & Ek,* for appellants.

*Norman A. Ericson* and *Lloyd A. Eyrich,* for respondents.

DONWORTH, J.—The town of Newport is a fourth class municipality located within the territorial limits of public utility district No. 1 of Pend Oreille county, which owns and operates an electrical distribution system serving residents of the town and also residents of the district residing outside of the town.

On July 6, 1949, the town council enacted ordinance No. 306, which adopted a plan and system for the construction and/or purchase of an electrical supply and distribution system for the town of Newport at an estimated cost of two hundred thousand dollars, payable in revenue bonds. The ordinance declared an emergency and requested the county auditor to call a special election to be held August 30, 1949, for the purpose of submitting this proposition to the qualified voters of the town for their ratification or rejection. At this election, 334 voters out of 800 registered voters cast their ballots. The result was 193 votes in favor of the proposal and 141 against it.

The plaintiffs are, respectively, the public utility district, a customer thereof who is a resident of the town of Newport, and another customer who resides in the district outside of the town. They instituted this action against the town, its mayor, and its councilmen November 10, 1949, to enjoin the defendants from issuing and selling the proposed revenue bonds and from carrying out the provisions of ordinance No. 306. They also prayed for a declaratory judgment and for general equitable relief.

By stipulation of the parties, a temporary injunction was issued for the purpose of maintaining the *status quo* until the case could be tried on its merits.

At the trial, plaintiffs made three principal contentions:

(a) That the election of August 30, 1949, was invalid because ordinance No. 306 was not effective until its publication on August 18, 1949, and, therefore, the notice of the closing of the registration books on July 30, 1949, against

original registrations given by the county auditor was an act performed without any authority.

(b) That the town was estopped from "seceding" from the public utility district after the district had issued its bonds based on the revenues produced by its system, eighty per cent of which came from customers residing in the town. (Plaintiffs offered to prove that it had outstanding an issue of revenue bonds in the principal amount of three hundred and twenty-five thousand dollars, and at least forty per cent of its revenues would be lost if the town were permitted to operate a competing distribution system. This offer of proof was rejected by the trial court.)

(c) That two municipal corporations may not exercise the same powers in the same area at the same time, and that, since the district had pre-empted the field by operating its distribution system, the town was precluded from operating a duplicating system within its limits.

At the close of the plaintiff's evidence, the trial court sustained the defendants' challenge to the sufficiency thereof in an oral decision in which it held that the election of August 30, 1949, was valid, saying:

"The plaintiffs complain that the election held in the Town of Newport on the 30th day of August, 1949, by which the voters approved the general plan and purpose of the proposed bond issue, was void and of no effect, because, as they allege, the notice of the closing of the registration books was not given for the time required by law, nor was the notice of accepting transfers from one precinct to another given for a sufficient length of time; that the failure, if any, of the officers of the Town of Newport to follow the statute with reference to the registration of voters and the transfer from one precinct to another, or from one ward to another, was an irregularity.

"The rule in such cases is that such an irregularity does not render the election void in the absence of a showing that the result would have been different if the officers had followed the law as contended for by the plaintiffs, and the voters had been permitted to register or transfer their registrations for the period contended for by the plaintiffs. I am of the opinion that the election held in the Town of Newport on the 30th day of August, 1949, was a valid election."

The decision then discussed in detail contentions (b) and (c) and concluded that there was no statute prohibiting the town, under the facts of this case, from operating a competing distribution system.

The trial court on the same day entered its judgment (containing certain findings and conclusions) dismissing the action and setting aside the restraining order theretofore issued.

Plaintiffs have appealed from this judgment, and upon their motion the trial court fixed the amount of their supersedeas bond at three thousand dollars. This bond was filed in the cause, the result being that the temporary injunction remains in effect pending the appeal.

Appellants have assigned as error the following acts of the trial court:

"1. The court erred in its Conclusion No. 1 declaring valid the special election and the resolution adopted for the sale of $200,000 in revenue bonds.

"2. The court erred in refusing to admit evidence by the plaintiffs to show the amount of the revenue bond issue by the District, the damage which another electrical distribution system in the same area would cause to the District, to the people of Newport, to the customers of the District and to the taxpayers of Pend Oreille county.

"3. The court erred in its Conclusion No. 3 and in dismissing the complaint, setting aside the temporary injunction, and refusing to grant a permanent injunction."

Turning first to a consideration of the second assignment, appellants argue that the trial court acted according to "harsh" statutory provisions of law without regard to the equitable factors which a court of equity should consider. As we view it, the trial court properly construed the statutes involved and declined to receive evidence as to the alleged damages which the district and its bondholders would sustain from the operation of a competing electrical distribution system in the town, and properly denied appellants' offers of proof as to the disadvantages arising from this situation.

The problem is one of statutory construction. We have examined the act adopted by the people in 1930 (Rem.

Rev. Stat., § 11605 [P.P.C. § 833-1] *et seq.*) authorizing the establishment of public utility districts, as subsequently amended by the legislature. In the light of that act, we have also read Rem. Rev. Stat., § 9488 *et seq.*, originally enacted in 1909, authorizing municipalities to acquire and operate certain utilities. In our opinion, these two statutes are not in conflict as applied to the facts here involved.

Appellants call our attention to the following provision of the public utility district act found in Rem. Rev. Stat., § 11615:

"When this act comes in conflict with any provision, limitation or restriction in any other law, this act shall govern and control."

This language is immediately followed by § 11616, reading as follows:

"This act shall not be deemed or construed to repeal or affect any existing act, or any part thereof, *relating to the construction, operation and maintenance of public utilities by* irrigation or water districts or *other municipal corporations,* but shall be supplemental thereto and concurrent therewith. No public utility district created hereunder shall include therein any municipal corporation, or any part thereof, where such municipal corporation already owns or operates all the utilities herein authorized; Provided, that in case it does not own or operate all such utilities it may be included within such public utility district for the purpose of establishing or operating therein such utilities as it does not own or operate: Provided, further, That no property situated within any irrigation or water districts or other municipal corporations shall ever be taxed or assessed to pay for any utility, or part thereof, of like character to any utility, owned or operated by such irrigation or water districts or other municipal corporations." (Italics ours.)

This section was quoted in *Public Utility Dist. No. 1 v. Superior Court,* 199 Wash. 146, 90 P. (2d) 737, which involved the right of the district to duplicate the utilities already operated by the cities of Blaine and Sumas and tax the property within those cities therefor. Construing this section, this court said:

"From this section, it clearly appears that it is not the intent of the law that a utility district may, within the boundary of a municipal corporation, duplicate utilities already owned or operated by the municipality, and assess the property within the boundaries of such municipal corporation for such duplication. The territory embraced within the limits of the cities [Blaine and Sumas] may be included within the utility district, because the cities do not own or operate all of the utilities contemplated by Laws of 1931, chapter 1, but their property cannot be taxed to construct, purchase, or support public utility district utilities already owned or operated by the cities."

There is no provision in the statute even intimating that a city or town which has been included within a public utility district is thereby deprived of the powers granted it by Rem. Rev. Stat., § 9488 et seq., to acquire or construct its own utilities. If it had been the intent of the people in adopting the public utility district act to deprive cities and towns situated within the borders of such districts of their right to exercise the powers vested in them by Rem. Rev. Stat., § 9488 et seq. (which they had been doing since 1909), the act should have specifically so provided. Instead of so doing, the act declared that it was supplemental to and concurrent with existing acts relating to the construction and operation of utilities by other municipal corporations. Furthermore, the legislature re-enacted § 9488 in 1947 without any substantial change.

We hold that these two statutes are operative independently of each other, and that there is nothing in the public utility district act (including the first proviso above quoted) which prevents the town of Newport from proceeding as contemplated in ordinance No. 306.

If it be considered undesirable that a city or town be permitted to acquire and operate a duplicating electrical distribution system where a public utility district is already serving the inhabitants of the town, that is a problem for the legislature—not the courts.

In this case, the corporate authorities of the town of Newport have seen fit to enact ordinance No. 306; and, since they have the power to proceed in accordance with

Rem. Rev. Stat., § 9488 *et seq.*, a court of equity will not review their action unless it is exercised in bad faith or unless it is clearly *ultra vires.* *Blade v. La Conner,* 167 Wash. 403, 9 P. (2d) 381.

■ The third error assigned raised the question whether two municipal corporations may exercise the same functions in the same territory at the same time. In support of the negative of this proposition, appellants call our attention to two of our prior decisions: *Royer v. Public Utility Dist. No. 1,* 186 Wash. 142, 56 P. (2d) 1302; *Bayha v. Public Utility Dist No. 1,* 2 Wn. (2d) 85, 97 P. (2d) 614.

The rule was recognized in these cases but was held not to apply to the facts involved therein. We think that this rule is applicable only where the two corporations are exercising governmental functions in contrast with proprietary functions. Here, the district is in the business of selling electricity to its customers. The town proposes to engage in the same business. Since the legislature has authorized each to so engage in such business, each may do so until the legislature forbids such competition.

The distinction between governmental and proprietary functions is recognized in Pond on Public Utilities (4th ed.) 14, § 5, where the author says:

"The powers of the municipal corporation in its capacity as an agent of the state are well defined and strictly limited by the statutory provisions granting them. There is little or no opportunity here for invoking the doctrine of liberal construction nor for extending its sphere of activity by the doctrine of implied powers. It is the duties of the sovereign that are to be performed in the manner provided by law and its interests alone are to be considered.

"On the other hand, the municipal corporation in its private proprietary and essentially business or commercial aspect acts as a property owner and the proprietor of a business enterprise for the private advantage of the city and its citizens as a distinct legal personality and may exercise its business powers very much in the same way as a private individual or corporation. In the erection and operation of gas works, electric light plants, waterworks and the like, as well as in contracting for such service and in attending to matters of local interest merely for the special benefit

and advantage of the city and its citizens, a municipal corporation acts as a business concern."

In *Paine v. Port of Seattle,* 70 Wash. 294, 126 Pac. 628; 127 Pac. 580, we said concerning the act authorizing the creation of port districts:

"We conclude that the law is not unconstitutional because by its terms it gives to a port district some of the powers and authorizes it to make expenditures and incur indebtedness for some of the things for which a county and city may make expenditures and incur indebtedness. We think the facts pleaded do not call for our decision upon any other question than this, in so far as counsel are relying upon the provisions of the constitution limiting the debt which municipal corporations may incur."

In the same case, on petition for modification, the distinction between the governmental functions of a city and the proprietary functions of a port district are described as follows:

"It [a port district] has no connection with either the city or county government and has a purpose independent of each of them. The chief purpose of a city or county is civil government, although much latitude may be given them in aid of the execution of their purposes. The object of this incorporation is to provide public terminal facilities for both sea and land commerce, or perhaps better, to provide a place open to the entire public where sea and land traffic may meet for the purposes of exchange. This being its object, we think it may be deemed a municipal corporation having an independent existence, and having power to incur an indebtedness on its own account up to the limitations fixed by the constitution, and the statute authorizing its incorporation."

We, therefore, hold that the rule referred to in the *Royer* and *Bayha* cases, *supra,* does not apply to two municipal corporations exercising proprietary functions as distinguished from governmental functions. Hence, the rule does not prevent the district and the town from each simultaneously owning and operating its own electric distribution system within the corporate limits of the town of Newport.

With regard to the first assignment involving the validity of the election, we have studied the several statutes cited

in the briefs relating to the calling of special elections in fourth class municipalities such as Newport. Rem. Rev. Stat., § 9169 [P.P.C. § 383-15] provides in part:

"All elections in such towns shall be held in accordance with the general election laws of the state, so far as the same may be applicable."

Rem. Rev. Stat., § 5150 [P.P.C. § 522-25] (as amended by chapter 161, Laws of 1949), now Rem. Supp. 1949, § 5150, relating to municipal elections other than in Class A and first class counties, contains a final clause, reading as follows:

"*Provided, further,* That whenever in the judgment of the governing board, an emergency exists, such board may, by resolution, call a special election at any time in such municipality or district, and at any such special election said governing board may combine, unite or divide precincts for the purpose of holding such special election and *every such special election so called shall be conducted and notice thereof given in the manner provided by law.*" (Italics ours.)

The town council could have passed a resolution declaring an emergency and calling a special election instead of so providing in ordinance No. 306. Such a resolution would have become effective immediately, whereas the ordinance did not become effective until its publication (August 18, 1949). However, the conclusion we have reached in this case makes it unnecessary to consider any legal distinction between a resolution and an ordinance. *Baker v. Lake City Sewer Dist.*, 30 Wn. (2d) 510, 191 P. (2d) 844.

We conclude that, since Rem. Rev. Stat., § 9488 *et seq.*, contain the exclusive method by which any municipality may acquire a utility system of this nature, those statutory provisions regarding the giving of notice of elections are the ones which must be complied with. In such a case as this, they state "the manner provided by law" referred to in § 5150, quoted above. The procedure to be followed is set forth in § 9489 (as amended by chapter 147, Laws of 1941), now Rem. Supp. 1941, § 9489 [P.P.C. § 416-3]:

"Whenever the City Council or other corporate authorities of any such city or town shall deem it advisable that the city or town of which they are officers shall purchase, acquire or construct any public utility mentioned in section 1 hereof [§ 9488] or make any additions and betterments thereto or extensions thereof, the common council or other corporate authorities shall provide therefor by ordinance, which shall specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, and the same shall be submitted for ratification or rejection to the qualified voters of said city at the general or special election, except in the following cases where no submission shall be necessary: . . .

"(3) If a general indebtedness is to be incurred, the amount of such indebtedness and the terms thereof shall be included in the proposition submitted to the qualified voters as aforesaid and such proposition shall be adopted and assented to by three-fifths of the qualified voters of the said city or town voting at said election. If no general indebtedness is to be incurred such proposition may be adopted by a majority vote. *Ten days' notice of such election shall be given in the newspaper doing the city or town printing, by publication in each issue of said paper during said time.* Whenever a proposition has been adopted as aforesaid, or in the cases mentioned in subdivisions first, second and third of this section where no submission shall be necessary, the common council or other corporate authorities of such city or town shall have the power to proceed forthwith to purchase, construct and acquire the public utility contemplated or to make additions, betterments and extensions thereto and to make payment therefor as hereinafter provided in section 3 and 4 hereof [§§ 9490, 9491]." (Italics ours.)

The sentence italicized above was not complied with either substantially or at all. As far as the evidence in this case shows, *no* notice of the election was given to the voters whatever. The publication of ordinance No. 306 on August 18, 1949, completed the steps necessary to make it a valid ordinance effective on that date (which was twelve days prior to the election), but the publication of the ordinance did not constitute a notice of election as required by the statute.

Parenthetically, we agree with the trial court that the fact that the county auditor closed the registration books before the ordinance became effective is no impediment to the validity of the election.  There is no evidence that any person appeared during this period and requested to be registered as a voter at the coming election.  Since no one was prevented from voting because of the closing of the registration books on and after July 30, 1949, this alleged premature closing of the books was an irregularity which had no effect on the result of the election.

■  We are unable to agree with the trial court's conclusion that the election was valid, however.  In our opinion, this case is similar to *Dunn v. Centralia,* 153 Wash. 495, 280 Pac. 26, in which the failure to give ten days' notice of the election, as required by Rem. Comp. Stat., § 9489 (now Rem. Supp. 1941, § 9489), was held to be fatal.

In holding that the election called to ratify the proposition that the city of Centralia would acquire a hydroelectric generating plant and pay the cost thereof with revenue bonds was invalid because of noncompliance with this statute regarding the giving of notice of election, we there said:

"The statutory notice requirement for a special election of this nature, in so far as the time of its giving is concerned, is found in our city and town public utilities statute, § 9489, Rem. Comp. Stat., and reads as follows:

" 'Ten days' notice of such election shall be given in the newspaper doing the city or town printing, by publication in each issue of said paper during said time.'

"There has not been called to our attention, and we are not aware of, any other prescribed statutory notice for such an election; so we proceed upon the assumption that the posting of the notices was no part of the official notice prescribed by the statute, and that therefore the posting of the notices was unofficial, the same as all other unofficial information acquired by the electors.

"The city's defense and the trial court's decision manifestly were rested upon the theory that, notwithstanding the want of publication of the official notice of the election in the city official newspaper during the period and for the number of publications required by the statute above

noticed, there was, by the single official publication, such substantial compliance with the statute as to render the election valid, when viewed in the light of the general unofficial publicity informing the voters of the coming election and its purpose.

"We may concede that the statutory requirement of giving official notice, even of a special election such as this, has often been held to be in a measure directory, in the sense that such requirement need only be substantially complied with when there is a large measure of general unofficial information concerning the coming election, reaching the public through newspapers, other printed circulated matter, posting of printed matter, discussion in public gatherings, etc.

"We think, however, it should not be held that the slight quantity of official notice given of this election, as compared with that prescribed by statute, becomes a substantial compliance with the statute. This court has liberally applied the substantial compliance doctrine in upholding the validity of special elections, but we think it has not in any sense, directly or inferentially, held that an official notice, such as this, though aided by unofficial information as was this notice, is sufficient to constitute a substantial compliance with a statutory requirement such as this. This official notice was but a slight step short of no official notice.

"*If the affirmative vote had, in number, been a majority of all the registered votes of the city, and thus all but conclusively shown that the result would have been the same,* even with the official notice given strictly as prescribed by the statute, *it is possible the single publication might be held to be in its effect,* in the light of the unofficial publicity here shown, *a substantial compliance with the statute. But we think it cannot be said in this case, with a sufficient degree of certainty, that there would have been a majority affirmative vote at the election* had the official publication of notice of the election been given as prescribed by the statute." (Italics ours.)

In the *Dunn* case, nearly seventy-three per cent of the registered voters went to the polls, and this court held the election invalid. In the instant case, only about forty per cent of the registered voters voted at the election and less than twenty-five per cent thereof voted in favor of the proposal.

Respondents argue that there was a substantial compliance with the applicable statute and that the rule adopted by this court in *Rands v. Clarke County*, 79 Wash. 152, 139 Pac. 1090, should apply. They refer to the following portion of the decision in that case:

"This court, however, early held that requirements of a statute providing for the giving of notices of an election, either general or special, were directory rather than mandatory, unless the statute itself declares that the election shall be void if the statutory requirements are not strictly observed, or the court can see from the record that the result of the election might have been different had there been a strict compliance with the statutory requirements."

We still adhere to the views expressed in that decision, but, applying them to the present case, we are convinced from the record that the result of the election might have been different if the statutory notice of election had been given in strict compliance with the statute.

A very recent decision on this subject is *Davies v. Krueger*, 36 Wn. (2d) 649, 219 P. (2d) 969, involving a water district election. We there applied the substantial compliance doctrine because actual notice of the election was given in the local press over a period of seven weeks by means of editorials, published notices of election, through placards displayed in public places, discussions at community, business and social clubs, and by means of a house-to-house canvass by a citizens' committee and the holding of general mass meetings.

In the instant case, there is not one word of testimony as to any means of information, formal or informal, written or oral, by which the voters were advised of the approaching election except the publication of ordinance No. 306 on August 18, 1949. As previously stated, the single publication of the ordinance did not constitute a notice of the coming election, and, even if it be so considered, the publication did not take place within ten days prior to the election, as required by § 9489 quoted above.

Referring to the *Dunn* case, this court said in the last cited case:

"Appellant in this case depends very largely upon *Dunn v. Centralia,* 153 Wash. 495, 280 Pac. 26, and contends that this case must be controlled by the last cited case. There is much merit in this contention. However, a reading of our opinions handed down since the decision in that case reveals that this court has departed very largely from the rule laid down there, so that it is no longer of much force in considering the election cases where the officials have failed or neglected to perform some act which has to do with the calling of an election, or the giving of notice thereof."

However, the *Dunn* case has never been overruled and is directly in point in the case at bar.

An even more recent application of the substantial compliance doctrine is found in *School Dist. No. 81 v. Taxpayers of School District No. 81,* 37 Wn. (2d) 669, 225 P. (2d) 1063, in which the facts as to the giving of actual information concerning the coming election were similar to those in the *Davies* case, *supra.* Both of these decisions are plainly distinguishable from the present case, since here the record shows absolutely no compliance whatsoever with the statutory requirement, either actual or substantial. There simply was not any notice of the coming election given to the voters of the town of Newport.

We hold that, for this reason, the election of August 30, 1949, is invalid; and the judgment is reversed and the cause remanded with instructions to enter a decree permanently enjoining respondents from carrying out the provisions of ordinance No. 306 and from selling the revenue bonds described therein, unless and until the proposition shall have been submitted to the voters of the town of Newport for their ratification or rejection and approved by a majority of those voting at an election duly and legally called for that purpose.

SCHWELLENBACH, C. J., BEALS, and HILL, JJ., concur.

FINLEY, J. (specially concurring)—I concur in the result, but disagree with the views of the majority in the following respects:

It appears to me that the factual situation involved in the instant case was not anticipated by the Washington legislature. Consequently, existing statutes do not solve this problem. Its solution, therefore, would depend upon the application of case law and precedent developed and established through judicial decisions. The applicable rule, sometimes characterized as an equitable doctrine or principle, appears to be well stated in *Bayha v. Public Utility Dist. No. 1,* 2 Wn. (2d) 85, 97 P. (2d) 614:

"Two municipal corporations, having concurrent jurisdiction and having in part the same granted powers, cannot exercise such identical powers, at the same time, in the same territory." (p. 103.)

See, also, *Royer v. Public Utility Dist. No. 1,* 186 Wash. 142, 56 P. (2d) 1302.

Realistically, the concept at the basis of the foregoing rule seems to be founded upon the working practicable principle, tersely stated, that, in a conflict of jurisdiction between two municipal corporations, the one first in time is first in right. *Taylor v. City of Fort Wayne,* 47 Ind. 274; *Birmingham School Dist. v. School Dist. No. 2,* 318 Mich. 363, 28 N. W. (2d) 265.

It is recognized that a distinction is frequently made between proprietary and governmental functions of a municipal corporation, and that the distinction has been held to be controlling in numerous situations. I cannot agree with the majority that the distinction between proprietary and governmental functions qualifies, in any way, in the instant case, the application of the equitable rule quoted above. The rule, as set forth in *Bayha v. Public Utility Dist. No. 1, supra,* seems to have been followed in the following cases: *Priest v. James,* 125 Ore. 72, 265 Pac. 1092 —conflicting port districts; *Independent Dist. of Sheldon v. Board of Supervisors of Sioux County,* 51 Iowa 658, 2 N. W. 590, and *Trumbull County Board of Education v. State ex rel. Van Wye,* 122 Ohio St. 247, 171 N. E. 241—conflicting school districts; *People ex rel. Bancroft v. Lease,* 248 Ill. 187, 93 N. E. 783—conflicting drainage districts; *In re Sani-*

*tary Board of East Fruitvale Sanitary Dist.*, 158 Cal. 453, 111 Pac. 368—conflicting sanitary districts; *Allied Amusement Co. v. Bryam*, 201 Cal. 316, 256 Pac. 1097—conflicting improvement districts (streets).